## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ASCOT VALLEY FOODS, LTD.,

*Plaintiff,*

v.

ADF FOODS (USA), LTD.,

*Defendant.*

Civil Case No. ___

## COMPLAINT AND JURY DEMAND

Plaintiff ASCOT VALLEY FOODS, LTD. ("Ascot" or the "Plaintiff"), by and through its attorneys Brach Eichler LLC, brings the following Complaint against Defendant, ADF FOODS (USA), LTD. ("ADF" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.     This is an action seeking:  (a) money damages for breach of a July 29, 2015 minimum quantity demand contract for the sale of goods between two merchants; (b) common law and UCC remedies related to the sale of goods; (c) equitable relief related to the purchase of materials unique to the Defendant and not sellable to other customers; and (d) a declaratory judgment determining with finality that the Co-Pack Agreement was terminated by the Plaintiff.

## PARTIES

2.     Plaintiff, ASCOT VALLEY FOODS, LTD. is a limited liability company formed and organized under the laws of the State of **Ohio**.

3.     Defendant, ADF FOODS (USA), LTD., is a corporation incorporated under the laws of the State of **Delaware**.

## SUBJECT MATTER JURISDICTION

4.      The Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1332(a)(2), because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states. 28 U.S.C. § 1332(c)(1).

5.      Ascot's principal place of business is located in 205 Ascot Pkwy, Cuyahoga Falls, State of **Ohio**.

6.      ADF's principal place of business is located in 800 South Claremont Street, San Mateo, State of **California**.

7.      Based upon the foregoing, complete diversity of jurisdiction exists between all parties to this action.

8.      This Court has supplemental subject matter jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S. Code § 1367, for the Plaintiff's account stated (Count I), breach of contract (Count II), goods sold and delivered (Count III), promissory estoppel (Count IV), sale of goods by seller (Count V), and declaratory judgment (Count VI) causes of action.

## VENUE

9.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(3) pursuant to an exclusive and mandatory forum selection clause in Paragraph (32) of the July 29, 2015 Co-Pack Agreement between Ascot and ADF designating the United States District Court of the Southern District of New York as the selected venue.

## EXHIBITS TO THE COMPLAINT

10.     Annexed hereto as **Exhibit "A"** to the Complaint is a true and accurate copy of the July 29, 2015 Co-Pack Agreement between the Plaintiff's predecessor-in-interest, Ascot Valley Foods, LLC, and Defendant, ADF, inclusive of all amendments and addendums thereto (hereinafter, the "Co-Pack Agreement").

2

11.     Annexed hereto as **Exhibit "B"** to the Complaint is a true and accurate copy of the Consent to Assignment of the July 29, 2015 Co-Pack Agreement from Ascot Valley Foods, LLC to the Plaintiff, Ascot Valley Foods, Ltd. (hereinafter, the "Assignment").

12.     Annexed hereto as **Exhibit "C"** to the Complaint is a true and accurate copy of a letter dated October 11, 2021, including a printout of a spreadsheet calculating the weighted average price per case and Invoice No. 2479, sent from Ascot to ADF via email to swathi@adf-foods.com and overnight mail via FedEx (hereinafter, the "October 11, 2021 Letter").

13.     Annexed hereto as **Exhibit "D"** to the Complaint is a true and accurate copy of a letter dated October 22, 2021 sent from Ascot to ADF via email to swathi@adf-foods.com and overnight mail via FedEx (hereinafter, the "October 22, 2021 Letter").

14.     Annexed hereto as **Exhibit "E"** to the Complaint is a true and accurate copy of a letter dated January 21, 2022, including an itemization of all outstanding balances on past due invoices, a copy of Invoice No. 2424, 2428, 2433, 2451, 2468, 2479, and 2831, sent from Ascot to ADF via email to swathi@adf-foods.com and overnight mail via FedEx (hereinafter, the "January 21, 2022 Letter").

15.     Annexed hereto as **Exhibit "F"** to the Complaint is a true and accurate copy of an email sent from jgorski@smdklaw.com to swathi@adf-foods.com and bimaltravel@adf-foods.com on October 11, 2021, at 11:58 AM, with the document(s) annexed herein as **Exhibit "C"** included as PDF attachment to said email.

16.     Annexed hereto as **Exhibit "G"** to the Complaint is a true and accurate copy of an email sent from alinen@smdklaw.com to swathi@adf-foods.com and bimaltravel@adf-foods.com on October 22, 2021, at 10:48 AM, with the document(s) annexed herein as **Exhibit "D"** included as PDF attachment to said email.

17.     Annexed hereto as **Exhibit "H"** to the Complaint is a true and accurate copy of an email sent from jgorski@smdklaw.com to swathi@adf-foods.com, bimaltravel@adf-foods.com and hari@hksamaroo.com on January 21, 2022, at 4:58 PM, with the document(s) annexed herein as **Exhibit "E"** included as PDF attachment to said email.

## BACKGROUND AND APPLICABLE NEW YORK STATE LAW

A.     Assignment of Co-Pack Agreement

18.     Plaintiff Ascot's predecessor-in-interest was Ascot Valley Foods, LLC.

19.     Ascot Valley Foods, LLC and Defendant ADF entered into the Co-Pack Agreement on July 29, 2015.

20.     On November 11, 2016, Plaintiff Ascot purchased all or substantially all of Ascot Valley Foods, LLC's business and assets (hereinafter, the "Acquisition").

21.     In connection with the Acquisition, Ascot Valley Foods, LLC and Plaintiff Ascot executed the Assignment.

22.     Paragraph 30 of the Co-Pack Agreement permitted assignment of the Co-Pack Agreement without ADF's written consent "to the purchaser of all or substantially all of [Ascot Valley Foods, LLC] business and assets, and [Ascot Valley Foods, LLC] may otherwise assign this Agreement by operation of law to any successor of [Ascot Valley Foods, LLC] due to merger or reorganization."

23.     Additionally, Plaintiff Ascot obtained the written consent to assign the Co-Pack Agreement from Ascot Valley Foods, LLC to Ascot Valley Foods, Ltd.

B.     Choice of Law

24.     Paragraph 31 of the Co-Pack Agreement states, "This Agreement shall be interpreted and enforced in accordance with the laws of the State of New York, without regarding

4

to conflict of law principles which would otherwise require application of the law of any other jurisdiction."

    a.    <u>Statutory Interest</u>

25.    In New York, pre-judgment interest is determined by state law, since interest is considered part of the substantive claim. <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64 (1938); <u>Quincy Mut. Fire Ins. Co. v. New York Cent. Mut. Fire Ins. Co.</u>, 89 F. Supp. 3d 291, 313 (N.D.N.Y. 2014).

26.    Under New York law, the application of pre-judgment interest is set forth in CPLR § 5001(a), which provides that such interest "shall be recovered" by a prevailing plaintiff in a breach of contract action or in an action involving "an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property."

27.    The use of the term "shall" in the statute has been found by the courts to make pre-judgment interest mandatory, not discretionary. <u>Spodek v. Park Prop. Dev. Assoc.</u>, 96 N.Y.2d 577, 581, 733 N.Y.S.2d 674, 676 (2001).

28.    CPLR § 5004 sets forth (9%) as the statutory rate of pre- and post-judgment interest in New York, calculated on a simple basis.

    b.    <u>New York's Uniform Commercial Code</u>

29.    New York's Uniform Commercial Code ("<u>UCC</u>") § 2-201(1) states, "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties … ."

30.    UCC § 2-201(2) states, "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party

BE:12484612.1/ASC016-281773

unless the written notice of objection to its contents is given within ten days after it is received."

31.    UCC § 2-105(1) states, "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."

32.    UCC § 2-104(1) states, "'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

33.    UCC § 2-103(1)(b) states, "'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

34.    New York's highest court, the New York State Court of Appeals, has held, "As in all contracts, implicit in contracts … is a covenant of good faith and fair dealing … ." Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 856 N.Y.S.2d 505, 886 N.E.2d 127 (2008).

35.    UCC § 1-202(a) states, in part, "a person has 'notice' of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all the fact and circumstances known to the person at the time in question, has reason to know that it exists."

36.    UCC § 1-202(d) states, "A person 'notifies' or 'gives' a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in the ordinary course, whether or not the other person actually comes to know of it."

BE:12484612.1/ASC016-281773

C.    Status of Transactions and Parties Pursuant to the UCC

37.    Paragraph 1 of the Co-Pack Agreement states, in part, "Co-Packer agrees to manufacture, produce, package, store, pick for shipment and stage for shipment for, and sell to, Company, and Company agrees to purchase from Co-Packer, the products listed in Exhibit A attached hereto (the "Products") on a product-by-product basis as Company shall reasonably request.  Co-Packer shall manufacture, produce and package the Products in compliance with the specifications attached hereto as Exhibit B (the "Specifications")."

38.    Exhibit A to or of the Co-Pack Agreement states, in part, a description of the Products, which include, without limitation, "Chicken Traditional Burrito," "Steak & Cheese Burrito," "Traditional Burgers," "Classic Meatballs," "Kale," and "Sweet Potato."

39.    Exhibit B to or of the Co-Pack Agreement described the "Specifications" of the Products.

40.    Exhibit C to or of the Co-Pack Agreement described "Quality Control and Testing" obligations and standards applicable to the Products.

41.    Paragraph 20 of the Co-Pack Agreement, titled, "Recipes; Formulas," states, in part, "the specific recipes and/or formulas provided by Company and used by Co-Packer in accordance with the Specifications for the Products (the "Formulas") will remain exclusive to Company … ."

42.    All references to the term "Company" in the Co-Pack Agreement refer to Defendant ADF.

43.    All references to the term "Co-Packer" in the Co-Pack Agreement refer to the Plaintiff, Ascot.

BE:12484612.1/ASC016-281773

44.     Defendant ADF made orders pursuant to the Co-Pack Agreement from July 29, 2015 through January 19, 2022.

45.     The Products described in the Co-Pack Agreement are things, or specially manufactured goods, which are movable at the time of identification to the contract for sale.

46.     ADF deals in goods of the kind described in the Co-Pack Agreement.

47.     ADF, by its occupation, holds itself out as having knowledge or skill peculiar to the practices or goods involved in the Co-Pack Agreement.

48.     Knowledge or skill may be attributed by ADF's employment of an agent or broker or other intermediary who by its occupation holds itself out as having such knowledge or skill to the practices or goods involved in the Co-Pack Agreement.

49.     ADF is a "merchant" within the meaning of UCC § 2-104(1).

50.     Ascot is a "merchant" within the meaning of UCC § 2-104(1).

51.     The Co-Pack Agreement concerned or involved the sale of "goods" within the meaning of UCC § 2-105(1).

D.      Specific Terms of the Co-Pack Agreement

52.     Paragraph (2) of the Co-Pack Agreement states, in part:

> The annual minimum order volume for Product to be ordered by Company from Co-Packer is 200,000 total cases in each year (12 month period from inception) of the Term of this Agreement ("Minimum Commitment").  For any Renewal Term, agreed upon minimum volume requirements will be mutually negotiated by Parties, provided, however, that if the Parties fail to agree upon new minimums, the current Minimum Commitment requirements shall remain in place … Notwithstanding the foregoing, if Company's purchase orders, in the aggregate as of the end of any year during the Term or Renewal Term, as applicable, fail to specify quantities of Product at least equal to the Minimum Commitment for such year as provided in this Section 2, Co-Packer, in its sole discretion, may send Company a written notice (including an invoice) of its purchase shortfall, which notice will create a binding obligation on Company

to purchase or pay for the balance of Company's Minimum Commitment."

53.     Paragraph 3 of the Co-Pack Agreement states, in part:

Co-Packer shall be precluded from selling identical products, derived from Company Intellectual Property, including the Specifications and Formulas, as well as other Proprietary Information provided in writing by Company to Co-Packer (the "Company Intellectual Property"), to others which are specifically made for the Company, irrespective of the brand.

54.     Paragraph 6 of the Co-Pack Agreement states, in part:

Co-Packer shall be responsible for timely procurement of and payment for all raw materials and ingredients used in the manufacture and production of the Products ("Raw Materials" and "Ingredients," respectively) and all packaging materials used for the Products (the "Packaging Materials" and collectively with Raw Materials and Ingredients, the "Materials").  All Materials shall comply with the Specifications.

55.     Paragraph 16(a) of the Co-Pack Agreement states, in part:

Co-Packer may terminate this Agreement upon ninety (90) days' written notice if Company (i) fails to make any payment due under this Agreement and such nonpayment continues ten (10) days after written notice from Co-Packer … .

## STATEMENT OF FACTS

56.     From July 29, 2020 through July 28, 2021, ADF failed to place orders for the minimum quantity of 200,000 cases with Ascot.

A.     October 11, 2021 Letter

57.     The October 11, 2021 Letter from Ascot to ADF stated, in part:

This letter shall serve as notice on behalf of Ascot to ADF that ADF's purchase orders during the Term year July 29, 2020 – July 28, 2021 failed to specify quantities of Product at least equal to the Minimum Commitment for such year, as required under Section 2 of the Agreement.  Specifically, ADF purchased 166,445 total cases during the prior Term year, less than the required Minimum Commitment amount of 200,000 total cases.

9

58.     The October 11, 2021 Letter from Ascot to ADF stated, in part:

> Ascot is sending ADF this written notice and the enclosed invoice for the purchase shortfall in the amount of $821,761.95 (33,555 cases multiplied by the weighted average case price of $24.49). Pursuant to Section 2, this notice creates a binding obligation on ADF to pay for the balance of ADF's Minimum Commitment.
>
> Please cause ADF to issue payment to Ascot on the enclosed Minimum Quantity invoice, immediately.  In the event ADF fails to issue payment on these invoices within ten (10) days after the date of this notice, Ascot will pursue all of its rights and remedies available under the Agreement and at law, including terminating the Agreement pursuant to Section 16(a) of the Agreement.

B.     <u>October 22, 2021 Letter</u>

59.     The October 22, 2021 Letter from Ascot to ADF stated, in part:

> As you are aware, I sent ADF notice of the Minimum Quantity payment obligation under Section 2 of the Agreement on October 11, 2021.  To date, Ascot has not received full payment on the amounts outstanding.  As a result, Ascot has elected to terminate the Agreement pursuant to Section 16(a) of the Agreement.  Please be advised that, unless otherwise agreed to by Ascot in writing, the Agreement will terminate and be of no further force or effect ninety (90) days from the date of this letter, January 20, 2022.

60.     The October 22, 2021 Letter from Ascot to ADF referred to Invoice No. 2424 and stated, "with a due date of 10/07/21 and a balance due of $744.46."

61.     The October 22, 2021 Letter from Ascot to ADF referred to Invoice No. 2428 and stated, "with a due date of 10/10/21 and a balance due of $23,627.50."

62.     The October 22, 2021 Letter from Ascot to ADF referred to Invoice No. 2433 and stated, "with a balance due date of 10/14/21 and a balance due of $29,080.00."

BE:12484612.1/ASC016-281773

C.     January 21, 2022 Letter

63.     The January 21, 2022 Letter from Ascot to ADF stated, in part:

> As provided in my letter to ADF dated October 22, 2021, the above-referenced Agreement has been terminated effective January 20, 2022.  To date, Ascot has not received payment on the outstanding invoices itemized on the enclosed schedule.  In addition, ADF is obligated under the Agreement to reimburse Ascot for the cost of unique raw materials and packaging purchased by Ascot on behalf of ADF, in the amount of $365,429.08.  Enclosed are copies of all of the outstanding invoices.  The total amount now due and payable is $1,287,897.99.

64.     Effective January 20, 2022, the July 29, 2015 Co-Pack Agreement had terminated.

65.     ADF failed to make payment in full satisfaction of the total account balance stated to be due and owing in an amount of $1,287,897.99.

66.     ADF continues to maintain the July 29, 2015 Co-Pack Agreement has not been terminated effective January 20, 2022.

67.     As a result of the foregoing, Ascot brings this action to recover the money damages it is due and owing as well as resolve with finality any disputes concerning the termination of the July 29, 2015 Co-Pack Agreement.

## COUNT I

## ACCOUNT STATED

68.     Plaintiff repeats and restates each of the allegations in the preceding paragraphs as though fully set forth and further allege as follows.

69.     On October 11, 2021, Ascot sent the October 11, 2021 Letter to ADF by email and FedEx.

70.     ADF did not dispute the fact that ADF did not place an order for 200,000 cases from July 29, 2020 through July 28, 2021.

BE:12484612.1/ASC016-281773

71.     ADF did not dispute that portion of the October 11, 2021 Letter stating, "ADF purchased 166,445 total cases during the prior Term year, less than the required Minimum Commitment amount of 200,000 total cases."

72.     ADF did not dispute that portion of the October 11, 2021 Letter stating, "weighted average case price of $24.49."

73.     ADF did not dispute that portion of the October 11, 2021 Letter stating, "purchase shortfall in the amount of $821,761.95 (33,555 cases multiplied by the weighted average case price of $24.49).  Pursuant to Section 2, this notice creates a binding obligation on ADF to pay for the balance of ADF's Minimum Commitment" within ten (10) days from when Ascot gave notice to ADF of the October 11, 2021 Letter.

74.      On October 22, 2021, Ascot sent the October 22, 2021 Letter to ADF by email and FedEx.

75.     ADF did not dispute the $744.46 amount stated for Invoice No. 2424 within ten (10) days from when Ascot gave notice to ADF of the October 22, 2021 Letter.

76.     ADF did not dispute the $23,627.50 amount stated for Invoice No. 2428 within ten (10) days from when Ascot gave notice to ADF of the October 22, 2021 Letter.

77.     ADF did not dispute the $29,080.00 amount stated for Invoice No. 2424 within ten (10) days from when Ascot gave notice to ADF of the October 22, 2021 Letter.

78.     On January 21, 2022, Ascot sent the January 21, 2022 Letter to ADF by email and FedEx.

79.     ADF did not dispute the $1,287,897.99 amount stated within ten (10) days from when Ascot gave notice to ADF of the January 21, 2022 Letter.

BE:12484612.1/ASC016-281773

80.     An implied agreement to pay the account stated can be inferred by ADF's silence, delay in providing any kind of response as between merchants in a transaction involving the sale of goods, and the absence of any good faith dispute as to the amount or fact of liability.

81.     As a result, the Plaintiff is owed $1,287,897.99 along with pre-judgment interest and post-judgment interest on its claim for an account stated in an amount to be determined at trial.

## COUNT II

## BREACH OF CONTRACT

82.     Plaintiff repeats and restates each of the allegations in the preceding paragraphs as though fully set forth and further allege as follows.

83.     A valid contract existed between Ascot and ADF, specifically, the Co-Pack Agreement.

84.     Ascot had performed its obligations pursuant to the terms of the Co-Pack Agreement.

85.     ADF failed to perform its obligations pursuant to the terms of the Co-Pack Agreement.

86.     Specifically, ADF failed to place an order for a minimum quantity of 200,000 cases.

87.     Additionally, ADF failed to pay for goods sold, delivered, and invoiced to ADF.

88.     As a result, the Plaintiff has been damaged in an amount of $821,761.95 (for failure to order a minimum quantity of 200,000 cases),  $100,706.96 (for ADF's failure to pay for goods sold, delivered, and invoiced to ADF), plus pre-judgment and post-judgment interest on its breach of contract claim in an amount to be determined at trial.

BE:12484612.1/ASC016-281773

## COUNT III

### GOODS SOLD AND DELIVERED

89.     Plaintiff repeats and restates each of the allegations in the preceding paragraphs as though fully set forth and further allege as follows.

90.     Ascot sold to ADF certain goods described in Invoice No. 2424, 2428, 2433, 2451, and 2468.

91.     Ascot delivered to ADF certain goods described in Invoice No. 2424, 2428, 2433, 2451, and 2468.

92.     The goods described in Invoice No. 2424, 2428, 2433, 2451, and 2468 were sold pursuant to an order placed by ADF to Ascot.

93.     As a result, the Plaintiff has been damaged in the amount of $100,706.96 plus pre-judgment and post-judgment interest in an amount to be determined at trial.

## COUNT IV

### PROMISSORY ESTOPPEL (CUSTOM GOODS UNIQUE TO BUYER)

94.     Plaintiff repeats and restates each of the allegations in the preceding paragraphs as though fully set forth and further allege as follows.

95.     Pursuant to the Co-Pack Agreement, Ascot was contractually obligated to be ready to fulfill orders unique to ADF's specifications.

96.     Pursuant to the Co-Pack Agreement, Ascot was contractually prohibited from re-selling products that were "identical" to ADF's products to other customers.

97.     In order to service the Co-Pack Agreement, and its contractual obligations to ADF, Ascot had ordered and paid for custom materials and packaging unique to ADF.

BE:12484612.1/ASC016-281773

98.    Ascot had ordered and paid for custom materials and packaging unique to ADF in the amount of $365,429.08.

99.    Pursuant to the Co-Pack Agreement, the promise to pay for 200,000 cases of goods unique and exclusive to ADF is clear and unambiguous.

100.    Ascot's reliance upon the Co-Pack Agreement was reasonable.

101.    Ascot's reliance upon Co-Pack Agreement was foreseeable.

102.    As a result, the Plaintiff has been damaged in the amount of $365,429.08 plus pre-judgment and post-judgment interest in an amount to be determined at trial.

## COUNT V

## SALE OF GOODS BY SELLER (UCC 2-703, 2-708, 2-709 REMEDIES)

103.    Plaintiff repeats and restates each of the allegations in the preceding paragraphs as though fully set forth and further allege as follows.

104.    The goods described in Invoice No. 2424, 2428, 2433, 2451, and 2468 were sold and delivered pursuant to an order placed by ADF to Ascot.

105.    ADF did not reject the goods described in Invoice No. 2424, 2428, 2433, 2451, and 2468 upon delivery.

106.    ADF accepted the goods described in Invoice No. 2424, 2428, 2433, 2451, and 2468.

107.    As a result, this Count being pleaded in the alternative, in the event that the Plaintiff does not prevail on its other available remedies, the Plaintiff may elect to proceed pursuant to UCC 2-703, 2-708 and 2-709 to calculate its damages in an amount to be determined at trial.

BE:12484612.1/ASC016-281773

## COUNT VI

## DECLARATORY JUDGMENT

108.     Plaintiff repeats and restates each of the allegations in the preceding paragraphs as though fully set forth and further allege as follows.

109.     ADF materially breached Section 16(a) of the Co-Pack Agreement.

110.     Ascot effectively terminated the Co-Pack Agreement pursuant the October 22, 2021 Letter when a ninety (90) day period had elapsed since Ascot gave notice to ADF of the October 22, 2021 Letter.

111.     As a result, the Plaintiff seeks a declaratory judgment declaring with finality that the Co-Pack Agreement has been terminated effective January 20, 2022.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter the following relief against all Defendants:

A.     Compensatory damages, direct damages, consequential damages, indirect damages, punitive damages and both pre-judgment and post-judgment interest;

B.     Requiring Defendants to pay or reimburse the Plaintiff its reasonable attorneys' fees and costs of suit incurred by the Plaintiff as foreseeable consequential damages arising from the breach of the implied covenant of good faith and fair dealing, especially between merchants, for the unjustified refusal to pay for past due accounts due and owing and requiring the Plaintiff to commence this instant action. Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 856 N.Y.S.2d 505, 886 N.E.2d 127 (2008);

C.     Such other and further relief that the Court deems equitable, just and proper.

BE:12484612.1/ASC016-281773

**BRACH EICHLER LLC**
101 Eisenhower Parkway, Suite 201
Roseland, NJ 07068
(973) 364-8372
bkasolas@bracheichler.com
*Attorneys for Plaintiff*

Dated: March 31, 2022                    By:

Angelo Langadakis III, Esq.

17

# EXHIBIT A

# CO-PACK AGREEMENT

THIS CO-PACK AGREEMENT (the "Agreement") is made and entered into to be effective as of <u>July 29, 2015</u>, between ADF Foods (USA) Ltd. ("Company"), and Ascot Valley Foods, LLC ("Co-Packer" and, collectively with Company, the "Parties").

## RECITALS

A.      Company and Co-Packer desire to enter into a business relationship pursuant to which Company will outsource to Co-Packer the production of, and Co-Packer will produce, certain products for the customers of Company.

B.      Company is willing to allow Co-Packer to review certain confidential information on the condition that Co-Packer agrees to keep such information confidential and not disclose such information to any other party or otherwise use the confidential information other than in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for and in consideration of these recitals, the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT

1.      <u>Manufacture and Purchase of the Products</u>. Subject to the terms and conditions hereof, during the term of this Agreement, Co-Packer agrees to manufacture, produce, package, store, pick for shipment and stage for shipment for, and sell to, Company, and Company agrees to purchase from Co-Packer, the products listed in <u>Exhibit A</u> attached hereto (the "Products") on a product-by-product basis as Company shall reasonably request. Co-Packer shall manufacture, produce and package the Products in compliance with the specifications attached hereto as <u>Exhibit B</u> (the "Specifications").  Company may, at its own discretion make changes to the Specifications at any time during the term of this Agreement and Co-Packer shall implement such changes within thirty (30) days following written notice or within such other period of time as the parties may agree.

2.      <u>Minimum Commitment; Volume Forecasts</u>.  The annual minimum order volume for Product to be ordered by Company from Co-Packer is 200,000 total cases in each year (12 month period from inception) of the Term of this Agreement ("Minimum Commitment"). For any Renewal Term, agreed upon minimum volume requirements will be mutually negotiated by Parties, provided, however, that if the Parties fail to agree upon new minimums, the current Minimum Commitment requirements shall remain in place. If Company elects to utilize a secondary co-packer to produce any of the Products, and the actual cases of Products ordered from Co-Packer falls below the Minimum Commitment amount in any year of the Term of this Agreement, Company will use its best efforts to move production from the secondary co-packer to Co-Packer to increase Co-Packer's production back to the Minimum Commitment level. Notwithstanding the foregoing, if Company's purchase orders, in the aggregate as of the end of any year during the Term or Renewal Term, as applicable, fail to specify quantities of Product at least equal to the Minimum Commitment for such year as provided in this Section 2, Co-Packer,

in its sole discretion, may send Company written notice (including an invoice) of its purchase shortfall, which notice will create a binding obligation on Company to purchase or pay for the balance of Company's Minimum Commitment.  By the 20th of each month, Company will provide Co-Packer with monthly rolling forecasts of estimated purchases of the Products for the following month from which production will be based; provided, however, that except to the extent of the Minimum Commitment, nothing contained in any forecast shall be deemed to be a representation, commitment or promise by Company to Co-Packer concerning the volume of purchases to be made by Company.

3.     Manufacture Exclusively at the Facilities and Exclusively for Company.  Co-Packer shall manufacture, produce, package and store the Products only at the facilities located in Cuyahoga Falls, Ohio (the "Facilities") unless Co-Packer and Company agree in writing that Co-Packer may manufacture, produce, package or store such Products at another facility, in which case such other facility shall be deemed a "Facility" for purposes hereof. Co-Packer shall manufacture, produce, package and store the Products in accordance with good manufacturing practices prevailing in the industry, all applicable laws, rules and regulations and in material compliance with the Specifications exclusively for Company and shall not produce, sell or otherwise dispose of such Products or use, disclose (directly or indirectly) the Specifications, to manufacture for, or distribute or sell products to, any third parties or for Co-Packer's own benefit. Co-Packer is prohibited from selling or donating the Products, non-conforming or otherwise, without the explicit written consent of Company. For the avoidance of doubt, the parties acknowledge that (i) subject to the Minimum Commitment requirements in Section 2, Company shall have the right to purchase the Products or products similar to the Products from third parties and Company shall not be precluded from entering into agreements similar to this Agreement with any third party and (ii) so long as Co-Packer is not in breach or violation of this Agreement, Co-Packer shall be precluded from selling identical products, derived from Company Intellectual Property, including the Specifications and Formulas, as well as other Proprietary Information provided in writing by Company to Co-Packer (the "Company Intellectual Property"), to others which are specifically made for the Company, irrespective of the brand

4.     Rejection of Product. Company may reject any Products that do not fully comply with the Specifications. If Company has previously paid Co-Packer for Products that are later rejected by Company and/or Retailers/Customers for failure to fully comply with Specifications, Company shall invoice Co-Packer, including all supporting documentation, for the cost of such rejected Products including the costs of any provided Materials and for any freight, handling or other disposition costs or expenses incurred by Company in connection with such rejected Products and shall receive credit from Co-Packer (or payment from Co-Packer, if no amounts are then due from Company to Co-Packer) within (30) days of such invoice.

5.     Compliance with Applicable Law: The Parties agree that Co-Packer will provide Products of consistent quality composed of safe and wholesome ingredients, manufactured, packaged, stored, and shipped under conditions compliant with all applicable federal, state, and local requirements.

6.     Raw Materials, Ingredients; Packaging Materials. Co-Packer shall be responsible for timely procurement of and payment for all raw materials and ingredients used in the

manufacture and production of the Products ("Raw Materials" and "Ingredients", respectively) and all packaging materials used for the Products (the "Packaging Materials" and collectively with Raw Materials and Ingredients, the "Materials"). All Materials shall comply with the Specifications. Co-Packer shall use commercially reasonable efforts to achieve purchasing synergies and ongoing reductions in Materials costs. Co-Packer shall store all Materials in accordance with good manufacturing practices prevailing in the industry and in strict compliance with the Specifications and the terms of this Agreement. Suppliers of Materials must be approved by Company; provided that Company acknowledges that Co-Packer's current suppliers are acceptable and are approved. Company and Co-Packer mutually agree to evaluate each Material to determine if each item should be purchased through a contract entered into between Company and the supplier of such item or a contract entered into between Co-Packer and the supplier of such item. Co-Packer shall be responsible for inspecting all Materials and shall immediately notify Company of any Materials that do not meet the Specifications. Co-Packer shall bear sole responsibility for all risk of loss or damage to such Materials while the same are in its care, custody or control.  Upon the expiration or earlier termination of this Agreement, Co-Packer shall cease the use of any Packaging Materials and shall return all unused Packaging Materials to Company or shall, at Company's request, destroy such Packaging Materials. If Company terminates this Agreement prior to the expiration of the Initial Term or Renewal Term for any reason (other than "for cause"), Company shall reimburse Co-Packer for Materials already purchased by Co-Packer for Products ordered by Company prior to the effective date of such termination.

7.   Quality and Inventory Control; Inspection and Notice.  Co-Packer shall manufacture, prepare, store and label according to the "Co-Packer Quality System Requirements, Testing and Records" procedures set forth on Exhibit C.  Co-Packer shall store and safeguard the inventory of Company's Products to protect it at all times from theft, damage or other loss in accordance with best practices in the industry and in strict compliance with the Specifications and terms of this Agreement. Company shall have the right at any time upon reasonable notice and during regular business hours (unless otherwise agreed) and at Company's expense to inspect and perform a physical count of the inventory of Company's Products using such personnel of Company or Company's representatives (including auditors) as Company determines to use in its sole discretion.  Co-Packer shall prepare and submit to Company quality control records and reports and shall retain one (1) sample for quality control purposes from beginning, middle, and end of each production batch of each of the Products for the period of time specified on Exhibit C. Company may request production samples from Co-Packer at any time, and Co-Packer shall send samples to Company at Company's cost unless otherwise agreed upon by the Parties in writing.  Co-Packer shall make available to Company, at the request of Company, the results of all federal, state and local inspection reports and sanitation audits, conducted from (90) days before to (90) days after the Term of this Agreement, including any Renewal Term.  Co-Packer shall notify Company immediately by telephone and in writing of any such inspections or audits, or any other information, that indicate that presence of any bacteriological agent or any substance that is considered by health authorities as being indicative of either unsanitary practices or of public health concern or if any of Co-Packer's facilities, processes, inventories or equipment are in an unsanitary condition as defined by 21 CFR Section 110 et seq. Co-Packer shall notify Company within 24 hours of any adulteration or potential misbranding of the Products.

7524713.1

8.    Prices.  The prices for the Products shall be as set forth in Exhibit A. The price per case must be detailed and include Material cost, handling upcharge and conversion cost. Upon request of the Company, Co-Packer will provide documentation of Materials costs including source and in-bound freight.  The Parties shall review Material Costs once every six (6) months to adjust for increases or decreases in the cost of raw materials and packaging materials of the Products. Any pricing adjustment request shall be sent to Company in writing with detailed supporting information showing the change in costs. Company shall have the right, in its sole discretion, to request additional supporting information. All pricing adjustments shall become effective only upon written agreement of the parties and ninety (90) days thereafter. So long as Co-Packer's request was reasonable and was supported by the requisite information as provided above, if the Parties are unable to agree on any such pricing adjustment, Co-Packer, upon notice to Company, may terminate this Agreement, at which time the Co-Packer will continue to honor the terms of the Agreement up to six (6) months, affording the Company sufficient opportunity to find an alternate co-packer.  Upon finalizing any pricing adjustments, the Parties will use their best efforts to revise Exhibit A accordingly.

9.    Purchase Orders. For Company to order any Products, Company shall place one or more purchase orders (the "Purchase Orders") to Co-Packer at least seven (10) business days before the due date as set forth in the applicable Purchase Order. The Purchase Orders may be provided by email, fax, electronic data interchange or other reasonable method agreed between the Parties. The Purchase Orders placed by Company shall be binding on Company and Co-Packer. Co-Packer shall manufacture, package, store and ship to Company the Products in the quantities and according to the terms and conditions set forth on the Purchase Order and in accordance with the Specifications by the due date specified in the Purchase Orders (the "Purchaser Order Due Date"). Each week, Co-Packer shall provide to Company the production and shipping schedule for Products and will provide accurate reporting of production amounts. Co-Packer shall manufacture and produce, test and pack the Products in the respective amounts. If Co-Packer fails to produce, test and pack the Products by the applicable Purchase Order Due Date, Co-Packer shall be responsible and shall pay and reimburse Company for any incremental cost to have such Products delivered to Company or Company's customer, including penalties/claims due to delays in delivery, if any, over the cost that would have been paid by Company had such Products been produced, tested and packaged by Co-Packer on a timely basis.

10.    Invoicing; Payment Terms.  Co-Packer shall invoice Company for finished Products after the applicable Purchase Order has been completed and fulfilled and in accordance with the prices set forth in Exhibit A. Title and risk of loss of the Products shall pass to Company immediately upon receipt of goods as set forth herein.  Invoices shall be sent by Co-Packer to Company by mail, email, fax, electronic data interchange or other reasonable method agreed upon by the Parties. Invoices shall include the agreed upon price for each Product.  Payment is due thirty (30) days (for Product shipped directly to retailers and/or distributors identified in the Purchase Order) and forty-five (45) days (for Product shipped directly to Company, including the Company's distribution center and/or warehouse) from receipt of goods. So long as Company remains current and in compliance with the foregoing payment terms, Company's payment may be made to Co-Packer by way of check.

11.    Records Retention: All books and records in connection with this Agreement, including receipts, and other supporting data as Company may reasonably request to verify the computation of all amounts invoiced shall be maintained by Co-Packer for the period of time specified on Exhibit A.

12.    Delivery. Physical delivery of the Products for Company under this Agreement shall be made at the Facilities of Co-Packer on or before the delivery due date specified in the applicable delivery order, pick list or other transfer request (each, a "Delivery Order") sent by Company to Co-Packer.  Delivery of the Products shall be deemed to have occurred (a) when loaded onto the vehicle of the delivery agent (the "Delivery Agent") designated by Company for shipment from a Facility as set forth in Delivery Order and (b) the bill-of-lading confirming the delivery to the Delivery Agent is in possession of Co-Packer. While the Products remain in the Facility, Co-Packer shall segregate and store them in such a manner so as to avoid the commingling of the Products with other merchandise stored at a Facility and so as to permit the ready identification of the Products to Company's account. Co-Packer shall take all necessary steps and precautions to protect the Products, and to safeguard the integrity and quality of same, while stored in a Facility. Co-Packer shall take all necessary steps and precautions to prevent the placement of any lien or other nature of encumbrance on the Products by any third party.

13.    New Product Development and Formula Changes. Co-Packer shall use commercially reasonable efforts to assist Company in the development of new products and/or the modification of existing Products to reduce costs and/or improve quality. All product development activities conducted for Company in Co-Packer's laboratory will be at Co-Packer's expense excluding the cost of ingredients utilized, the cost of which will be borne by Company. Production tests will be billed by Co-Packer to Company as agreed on in advance of such testing on case by case basis plus the cost of any Materials used in the test. Co-Packer will provide to Customer an estimate of the number of full and/or $1/2$ days that will be required for any production test, prior to any scheduled test days. All such new Products or modifications undertaken primarily for Company (and at Company's written request) shall be the sole property of Company. All modifications to recipes and/or product packaging proposed by Co-Packer shall be undertaken solely upon receipt of written approval by Company.

14.    Reporting.  Co-Packer shall prepare, maintain and retain complete and accurate books and records relating to the production, packaging, testing, storage and shipment of Raw Materials, Ingredients, Packaging Materials and the Products for a period of at least twenty-four (24) months from the date of manufacture in such form as Company may now or hereafter reasonably require and, upon request by Company, to periodically furnish Company with such information in a format required by Company.  Co-Packer shall also prepare, maintain and retain any other records required to be maintained under this Agreement or required to be kept by federal, state or local laws, rules and regulations. Co-Packer shall prepare and submit to Company other reports as reasonably requested by Company from time to time.

15.    Term.  The initial term of this Agreement shall be two (2) years from the date that Parties mutually agree in writing that formula qualification is materially complete and production has commenced, unless earlier canceled or terminated as provided in Section 12 ("Initial Term"). Following the Initial Term, and thereafter following each Renewal Term (as hereinafter defined), the term of this Agreement shall automatically renew for one (1) year (each, a "Renewal Term"),

unless Company or Co-Packer gives notice to the other of its intention to not renew the Agreement at least one hundred and eighty (180) days prior to the expiration of the then-current term.  In the event that either Party gives a non-renewal notice, company shall have the right to require Co-Packer to continue to manufacture Products for up to one hundred and eighty (180) days following the expiration date on the same terms as in effect prior to expiration.

16.    Termination.

(a)    Co-Packer may terminate this Agreement upon ninety (90) days' written notice if Company (i) fails to make any payment due under this Agreement and such nonpayment continues ten (10) days after written notice from Co-Packer or (ii) fails to perform any other obligation under this Agreement and such failure continues thirty (30) days after written notice from Co-Packer.  Company may terminate this Agreement upon giving thirty (30) days' written notice identifying specifically the basis for such notice for breach of a material term or condition of this Agreement, provided that Co-Packer shall not have cured such breach within the thirty (30) day period; and provided further that a termination for contamination or adulteration of a Product, unless otherwise specified, shall be immediate (i.e., without cure period).

(b)    Either Party hereto may terminate this Agreement effective immediately upon written notice to the other Party if the other Party: (i) files a voluntary petition in bankruptcy or has an involuntary bankruptcy petition filed against it, which is not dismissed within ninety (90) days after its institution, (ii) is adjudged as bankrupt, (iii) becomes insolvent, (iv) has a receiver, trustee, conservator or liquidator appointed for all or a substantial part of its assets, (v) ceases to do business, (vi) commences any dissolution, liquidation or winding up, or (vii) makes an assignment of its assets for the benefit of its creditors.

(c)    Each Party reserves the right upon a breach of this Agreement by the other Party to pursue all of its legal and equitable remedies.

(d)    Either Party may terminate this Agreement at any time on or after the second anniversary (i.e. during any renewal Term) without payment of any termination fee upon giving ninety (90) days' written notice to other Party. If Co-Packer elects to terminate this agreement, Company shall have the right to require Co-Packer to continue to manufacture Products for up to one hundred and eighty (180) days following the termination date on the same terms as in effect prior to termination.

17.    Indemnification.

(a)    Co-Packer shall and does hereby indemnify, defend and hold Company harmless arising out of, or related to, (i) a breach by Co-Packer, its employees or representatives of any representation, warranty, covenant, or other obligation pursuant to this Agreement; (ii) any manufacturing or packing defect of the Products; (iii) any product liability claim and any consumer, customer or governmental authority complaints, demands, claims or legal actions alleging illness, injury, death or damage as a result of consumption or use of any Product produced, packaged, stored or shipped by Co-Packer or its agents; or (iv) the gross negligence, bad faith or willful misconduct of Co-Packer, its employees or representatives. Notwithstanding the foregoing, Co-Packer shall have no obligation to indemnify, defend or hold harmless

Company to the extent that any such damage relates, in any manner, to a defect in the Recipes provided by Company to Co-Packer or to Co-Packer's use (in accordance with this Agreement) of Company Intellectual Property.  Notwithstanding anything to the contrary in this Agreement, Co-Packer shall not be liable to Company for any consequential damages, lost profits, punitive damages or other speculative damages of any kind.

(b)     Company shall and does hereby indemnify, defend and hold Co-Packer harmless arising out of, or related to, (i) a breach by Company, its employees or representatives of any representation, warranty, covenant, or other obligation made by them pursuant to this Agreement; (ii) any manufacturing defect of the Products relating to a defect in the Recipes; (iii) any product liability claim and any consumer, customer or governmental authority complaints, demands, claims or legal actions alleging illness, injury, death or damage as a result of consumption or use of any Product produced, packaged, stored or shipped by Co-Packer or its agents relating to a defect in the Recipes; (iv) the gross negligence, bad faith or willful misconduct of Company, its employees or representatives; or (vi) any infringement suit brought against Co-Packer in connection with its use of any Company Intellectual Property in manufacturing Product in accordance with this Agreement. Notwithstanding anything to the contrary in this Agreement, Company shall not be liable to Co-Packer for any consequential damages, lost profits, punitive damages or other speculative damages of any kind.

18.     <u>Insurance</u>.  Co-Packer shall maintain commercial general liability insurance (including products liability and contractual liability), with limits of not less than $2.0M combined single limit, for bodily injury or death to any person or persons and loss or damage to any property. Such insurance shall be written by an insurance carrier rated 'A' or better by Best's Guide Insurance Rating, and shall name Company as an additional insured. Products Recall Liability insurance shall be carried by Co-Packer with a limit of $1.0M per occurrence and include Company as additional insured.

19.     <u>Trademarks</u>: Nothing in this Agreement shall give Co-Packer any right, title or interest in Company's trademarks. In addition, Co-Packer shall not adopt any trademark, trade name, trade dress, labeling or packaging which is deceptively similar to or likely to cause confusion with respect to any of Company trademarks or with respect to Products.

20.     <u>Recipes; Formulas</u>: The Parties agree that the specific recipes and/or formulas provided by Company and used by Co-Packer in accordance with the Specifications for the Products (the "<u>Formulas</u>") will remain exclusive to Company and will not be disclosed by the Co-Packer to other customers of the Co-Packer or to any other person or entity. Company hereby grants to Co-Packer a limited, non-exclusive, non-transferable license to use the Formulas for the purpose of allowing Co-Packer to perform its obligations under this Agreement.

21.     <u>Confidentiality</u>.

(a)     Each Party (as such, a "<u>Recipient</u>") acknowledges that, for the purposes of carrying out its obligations herein, it has had and will have access to certain Proprietary Information (as defined below) of the other (as such, the "<u>Disclosing Party</u>"), concerning the Disclosing Party's business, plans, products, processes and technical data which is confidential

and of substantial value and which would be impaired if such information were disclosed to third parties.

(b)     For purposes of this Agreement, "Proprietary Information" means all information, whether previously, presently, or subsequently disclosed to Recipient, that has commercial or other value to the Disclosing Party and is confidential in nature (including, but not limited to, business and product plans, customer lists, recipes and/or recipe concepts, computer programs, technical drawings, algorithms, trade secrets, patent applications, patentable subject matter, technology, layouts, names and expertise of employees and consultants, know-how, formulas and/or formulations, processes, ideas, inventions (whether patentable or not), technical business, financial, customer and product development plans, forecasts, strategies, and information, and any derivatives of the preceding), whether or not such information is labeled "Confidential" or "Proprietary" or with words of similar meaning. Recipient further agrees that the terms and conditions of this Agreement are also deemed to be "Proprietary Information". Notwithstanding the foregoing, "Proprietary Information" shall not include any information which (i) is or becomes generally available to the public other than as a result of a disclosure by Recipient or its employees or representatives in violation of this Section 21; (ii) was rightfully available to Recipient on a non-confidential basis prior to its disclosure by the Disclosing Party; (iii) becomes available to Recipient on a non-confidential basis from a person other than the Disclosing Party or its agent, employee, or representative who is not bound by a confidentiality agreement with the Disclosing Party, or is otherwise not under an obligation to the Disclosing Party not to transmit information to Recipient; or (iv) was independently developed without reference to or use of the Proprietary Information.

(c)     Recipient agrees to (i) hold and use the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions Recipient employs with respect to its confidential materials); (ii) not to divulge any such Proprietary Information or any information derived therefrom to any third person; and (iii) not to make any use whatsoever at any time of such Proprietary Information other than to comply with its obligations under this Agreement. Proprietary Information shall be disclosed only to the employees or representatives of Recipient who have a "need to know" such Proprietary Information. In any event, Recipient shall be responsible for any breach of the provisions of this Section 21 by any of its agents, employees or representatives.

(d)     In the event Recipient is requested pursuant to, or required by, applicable law or by legal process to disclose any Proprietary Information, Recipient shall provide the Disclosing Party with prompt notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy.  In the event such protective order or other remedy is not obtained, or the Disclosing Party waives compliance, in whole or in part, with the terms of this Section 21, Recipient shall disclose only that portion of the Proprietary Information which is legally required to be disclosed and shall ensure that all Proprietary Information that is so disclosed will be accorded confidential treatment.

(e)     Recipient acknowledges and agrees that in the event of a breach or threatened breach of any provision of this Section 21, the Disclosing Party shall have no adequate remedy at law and shall therefore be entitled to enforce any such provision by

temporary or permanent injunctive or mandatory relief obtained in any court without the necessity of proving damages, posting any bond or other security, and without prejudice or diminution of any other rights or remedies which may be available at law or in equity.

(f)     Upon termination of this Agreement or at any time upon the Disclosing Party's prior written request, Recipient shall return all Proprietary Information to the Disclosing Party and destroy all copies, reproductions, summaries, analyses or extracts thereof or based thereon (whether in paper or electronic form) in Recipient's possession, custody or control.

(g)     The provisions of this Section 21 shall survive the expiration or termination of this Agreement for any reason.

22.     <u>Specific Performance; Enforceability</u>. The parties acknowledges that a breach of the provisions contained in Section 21 may cause irreparable damage to the Disclosing Party, and upon breach of any such provisions, the Disclosing Party will be entitled to seek, from a court of competent jurisdiction, injunctive relief, specific performance or other equitable relief without bond or other security; provided, however, that the foregoing remedies will in no way limit any other remedies the Disclosing Party may have. If any provision, or any part thereof, of Section 21 as applied to a party hereto or to any circumstance, is adjudged by a governmental authority, court, arbitrator, or mediator not to be enforceable in accordance with its terms, the same will in no way affect any other circumstance or the enforceability of the remainder of this Agreement. If any such provision, or any part thereof, is held not to be enforceable in accordance with its terms because of the duration of such provision, the area covered thereby, or the scope of the activities covered, the parties hereto agree that the governmental authority, court, arbitrator, or mediator making such determination will have the power to reduce the duration, area, and/or scope of activities of such provision, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable in accordance with its terms and will be enforced.

23.     <u>Force Majeure</u>.  "<u>Force Majeure</u>" shall mean any event or combination of events including, but not limited to, acts of God or nature not existing as of the date of this Agreement, not reasonably foreseeable as of such date and not within the reasonable control of either Party, which prevents in whole or in material part the performance by one of the Parties of its obligations hereunder.  A Party affected by an event of Force Majeure shall promptly notify the same to the other and the Party so affected shall be released without liability on its part from the performance of its obligations under this Agreement but only to the extent and only for the period that its performance of such obligations is prevented by the event of Force Majeure. During the period that the performance by a Party of its obligations under this Agreement has been suspended by reason of an event of Force Majeure, the other Party may likewise suspend the performance of all or part of its obligations hereunder to the extent that such suspension is commercially reasonable. Should an event of Force Majeure continue for more than sixty (60) consecutive days, either Party may terminate this Agreement immediately without liability to the other Party.

24.     <u>Relationship Between the Parties</u>.  This Agreement does not make either Party the employee, agent, or legal representative of the other for any purpose whatsoever or constitute a joint venture or partnership between the Parties. Except as otherwise provided herein, neither Party is granted any right or authority to assume or to create any obligation or responsibility,

7524713.1

express or implied, on behalf of or in the name of the other Party. In fulfilling its obligations pursuant to this Agreement, Co-Packer shall be acting as an independent contractor.

25. <u>Notices</u>. Any notice required or permitted under this Agreement shall be given in writing and shall be given by personal delivery, via overnight courier requiring a signature for delivery, or by certified mail, return receipt requested. All notices shall be delivered to the addresses last specified in writing by the Parties.

26. <u>Severability</u>. If any provision of this Agreement or part thereof is rendered void, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

27. <u>Precedence</u>. In the event of a conflict between the terms of this Agreement and the terms of any Purchase Order or any Delivery Order, the terms of this Agreement shall govern.

28. <u>Costs</u>. Unless otherwise provided herein, each Party shall bear its own costs and expenses incurred by it in connection with the negotiation, execution and delivery of this Agreement.

29. <u>Entire Agreement; Amendment</u>. This Agreement constitutes the entire agreement between the Parties hereto with respect to its subject matter. Each Party acknowledges that in entering into this Agreement, it does not rely on any representation warranty or other provision except as expressly provided in this Agreement and, accordingly, all conditions, warranties or other terms, implied by statute or common law are hereby excluded to the fullest extent permitted by law. Except as expressly provided herein, no modification, amendment or waiver of any of the provisions of this Agreement shall be effective unless made in writing and duly signed by each of the parties thereto making specific reference to this Agreement.

30. <u>Assignment</u>. This Agreement shall be binding on each Party hereto and their respective successors and permitted assigns. Neither Party may assign this Agreement without the prior written consent of the other, which consent will not unreasonably be withheld or delayed; provided, that notwithstanding the foregoing, either Party may assign this Agreement without such consent to the purchaser of all or substantially all of such Party's business and assets, and may otherwise assign this Agreement by operation of law to any successor of such Party due to merger or reorganization.

31. <u>Governing Law</u>. This Agreement shall be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles which would otherwise require application of the law of any other jurisdiction.

32. <u>Jurisdiction and Venue</u>. The parties agree that any suit, action or proceeding concerning, related to or arising out of this Agreement shall only be brought in the state or federal courts in the neutral County of New York, NY and waive any objection to the venue, including forum non convenes, of any such suit, action or proceeding.

33. <u>Waiver of Trial by Jury</u>. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, COMPANY AND CO-PACKER HEREBY IRREVOCABLY AND

EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF COMPANY IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF.

34.　　<u>Contract Interpretation</u>.  The parties are sophisticated and have been represented (or have had the opportunity to be represented) by their separate attorneys in connection with the negotiation and drafting of this Agreement. As a consequence, the parties do not intend that the presumptions of laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement, and therefore waive their effects.

*[Signature page follows.]*

7524713.1

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement effective as of the date first written above.

Company:

ADF Foods (USA) Ltd.

By:_____
     Bimal Thakkar, CEO


Co-Packer:

Ascot Valley Foods, LLC

By:_____
     Keith A. Kropp, CEO

7524713.1

## Exhibit A

## Products & Pricing

| Item # | Type / Brand | Description | Customer | Label UPC | Gross Case Weight | Cost/Unit |
|---|---|---|---|---|---|---|
| F100RP1201 | PJ's Organic | Chicken Traditional Burrito | Retail | 0 72169 12165 0 | 5.0 lbs. | $11.00 |
| F100RP1202 | PJ's Organic | Chicken Skinny Burrito | Retail | 0 72169 02867 6 | 5.0 lbs. | $11.00 |
| F100RP1204 | PJ's Organic | Chicken Southwestern Burrito | Retail | 0 72169 12866 6 | 5.0 lbs. | $11.00 |
| F100RP1205 | PJ's Organic | Steak & Cheese Burrito | Retail | 0 72169 12265 7 | 5.0 lbs. | $11.00 |
| F100RP1206 | PJ's Organic | Turkey Breakfast Burrito | Retail | 0 72169 12365 4 | 5.0 lbs. | $11.00 |
| F100RP1207 | PJ's Organic | Denver Breakfast Burrito | Retail | 0 72169 12395 1 | 5.0 lbs. | $11.00 |
| F100RP1208 | PJ's Organic | Skinny Breakfast Burrito | Retail | 0 72169 12385 2 | 5.0 lbs. | $11.00 |
| F100RP1209 | PJ's Organic | SurfsUp Breakfast Burrito | Retail | 0 72169 12375 3 | 5.0 lbs. | $11.00 |
| F100RP1210 | PJ's Organic | Chicken & Green Chili Burrito | Retail | 0 72169 12176 6 | 5.0 lbs. | $11.00 |
| F100CP1602 | PJ's Organic | Chicken Skinny Low Fat Burrito | Costco | 0 72169 02867 6 | 41.0 lbs. | $75.39 |
| F100CP1603 | PJ's Organic | Chicken Skinny Burrito Low Fat | Canada | 0 72169 02867 6 | 41.0 lbs. | $75.39 |
| F100CP1608 | PJ's Organic | Bean &Cheese Burrito | Costco | 0 72169 03887 3 | 41.0 lbs. | $66.40 |
| F400PW4231 | Whole Foods | Traditional Burgers | Whole Foods | 0 99482 44324 5 | 9.0 lbs. | $12.35 |
| F400PW4232 | Whole Foods | Spicy Southwestern Burgers | Whole Foods | 0 99482 44325 2 | 9.0 lbs. | $12.35 |
| F400PW4233 | Whole Foods | Breakfast Patties | Whole Foods | 0 99482 44326 9 | 7.0 lbs. | $11.05 |
| F300PZ0002 | Ziyad Retail | Kibbehs 8/1# | Ziyad Brothers | 0 74265 02180 3 | 10.4 lbs. | TBD |
| F400RN7205 | Nate's | Classic Meatballs | Retail | 0 72169 30010 9 | 8.8 lbs. | $12.30 |
| F400RN7206 | Nate's | Mushroom Meatballs | Retail | 0 72169 30020 8 | 8.8 lbs. | $12.30 |
| F400RN7207 | Nate's | Zesty Italian Meatballs | Retail | 0 72169 30030 7 | 8.8 lbs. | $12.30 |
| | Nate's | Kale | Retail | 0-72169-40001-4 | 7.5 lbs. | $14.62 |
| | Nate's | Southwestern | Retail | 0-72169-40004-5 | 7.5 lbs. | $14.62 |
| | Nate's | Sweet Potato | Retail | 0-72169-40003-8 | 7.5 lbs. | $14.62 |
| | Nate's | Garlic & Pesto | Retail | 0-72169-40002-1 | 7.5 lbs. | $14.62 |
| | Soul | Chicken Tikka Naanzza | Ethnic | 8-39451-00443-1 | 5.25 lbs. | $15.75 |
| | Soul | Butter Chicken Naanzza | Ethnic | 8-39451-00442-4 | 5.25 lbs. | $15.75 |
| F400FN7704 | Bulk | Classic MB 10# | Retail | NA | 10.4 lbs. | $13.45 |
| F400FN7706 | Bulk | Mushroom MB 10# | Retail | NA | 10.4 lbs. | $15.15 |
| F400PT7301 | Trader Joe's | MB Classic | Trader Joe's | 0039 1276 | 24 lbs. | $34.10 |

## Exhibit B

**Specifications**
**(see attachment)**

7524713.1

**Exhibit C**

**Co-Packer Quality System Requirements, Testing and Records**

| | |
|---|---|
| **Applicable laws, regulations, and requirements** | All Products shall be of consistent quality composed of safe and wholesome ingredients, manufactured, prepared, packed, held, labeled, and shipped under conditions compliant with all applicable U.S. and Canadian federal, state, and local requirements including but not limited to applicable laws, regulations, and guidelines adopted by (i) the Food and Drug Administration ("FDA") pursuant to the Federal Food, Drug, and Cosmetic Act, as amended (the "Act") and the Public Health Security and Bioterrorism Preparedness and Response Act (the "Bioterrorism Act"), including but not limited to the food safety, composition, labeling, registration, and manufacturing provisions and current industry good manufacturing practices; (ii) the United States Department of Agriculture ("USDA") and Food Safety Inspection Service ("FSIS"), including but not limited to the National Organic Program and the organic food regulations adopted pursuant to the Federal Organic Foods Production Act; (iii) applicable state and local authorities responsible for regulating the manufacture, preparation, packing, storage, labeling, and shipment of food products and establishments, including without limitation the California Organic Foods Act, as amended and all applicable organic food certification programs; and (iv) Health Canada pursuant to the Food and Drugs Act, as amended, and the Canadian Food Inspection Agency pursuant to the Canada Agricultural Products Act and the Organic Products Regulations. |
| **Production Records** | Facility and production records must be maintained including, but not limited to, pest control, receiving and inspection, batch records, processing, weight control, calibration, sanitation audits and procedures, and training. |
| **Organic Program (If Applicable)** | Facility must be certified Organic by a third party agency accredited by the USDA National Organic Program. All Organic policies and procedures must be followed as outlined in 7 CFR Part 205. All documentation and records must be maintained for five years. |
| **Quality Testing** | Incoming ingredient and in process checks must be conducted to ensure that the manufacturing process is in control and that finished Products meet all Specifications. Testing shall include (as applicable) pH, titratable acidity, batching and processing validation, sensory, packaging checks, and net contents. Finished Products will be tested (as applicable) for pH, % titratable Acidity, and Microbiological tests, or other tests determined necessary to ensure that they meet those specifications provided by the Company. |
| **Food Safety & Quality Requirements** | There shall be a food safety program such as HACCP to address the following: Receiving ingredients, packaging, and labels and how to address if these items do not meet specification; Regulatory requirements such as allergen control, pest control, environmental control, organic control (if |

applicable), non-GMO control, etc.; product testing requirement such as microbiological (i.e. coliform, E.coli, aerobatic bacterial count, yeast/mold, etc.) and chemical (i.e. pH, TA, % salt, etc.); and customer/consumer complaint issue(s). HACCP program shall not be limited to only items mentioned above, it also shall cover work-in-process and their controls. In addition, there shall be a program to address all quality steps of process especially the finished product such as organoleptic testing.

| | |
|---|---|
| **Record Retention** | Manufacturing and Quality records must be retained for a minimum of (2) years for non-organic products, and (5) years for organic products. |
| **Certificate of Analysis** | Company may request a Certificate of Analysis that would document and summarize the in-process and finished product testing. |
| **Retain Samples** | Representative samples from a production run must be collected and submitted to Company per the frequency outlined in the manufacturing specification. Retain samples must also be collected and stored at the manufacturing location for the duration of the product shelf-life plus six (6) months. |
| **Third Party Audits** | Facility must annually undergo and successfully pass one of the following recommended GFSI Scheme Audits: SQF Audit, or BRC Audit. Alternate audits permitted with Company management approval. Corrective Action plans must be developed and implemented for all significant deficiencies identified in the audit. Company may request copies of detailed findings and/or corrective action plans of Co-Packer's audit. Results of audit must be submitted to Company when available. |
| **Company Audits** | Company has the right to inspect manufacturing and warehouse facilities where machines are in operation, and where finished Product, ingredients, and packaging materials are stored. During the course of the audit, Company's designated representatives have the authority to stop production of Products, reject Products for sale or shipment, and implement withdrawal of Product that do not meet Company Specifications at the expense of the Co-Packer. On occasion, random samples of raw materials, ingredients, and finished product may be collected by Company personnel and forwarded to an independent laboratory for analysis (at Company's expense). The purpose is to survey Product to assure compliance to microbiological, physical, or chemical specifications. |
| **Regulatory Inspections** | If at any time the FDA, State, OSHA, CFIA, Health Canada, or any governmental regulatory agency enters the Co-Packer's facility to inspect Company Product, Company's designated representatives MUST be notified immediately. |

Regulatory Samples:

If samples are collected by a regulatory official during manufacture or from storage, a triplicate sample is to be taken by the factory.

1.  Sampling equipment utilized by plant personnel, such as plastic bags, sterile plastic bags, paper bags, sterile utensils, etc. should be identical to that which the Inspector uses during collection.

2.  Sufficient sampling equipment should be available, properly prepared, and readily attainable for both the Inspector's and factory use.

3.  It is imperative that samples be collected in exactly the same manner as the Inspector uses. The material should be handled with an instrument similar to that used by the Inspector.

4.  Collect three samples in addition to the one taken by the inspector. The triplicate product should be taken from the closest proximity to the regulatory sample as possible (e.g., the next package produced). The amount of sample taken should be approximately three (3) times as much as the Inspector samples.

5.  Samples must be labeled or otherwise adequately identified with the following minimum information:

    a.  Date and Time of Day.

    b.  Location: Line pallet number, etc.

    c.  Lot number or production code.

    d.  Name of substance: Commodity code, product code or other identification number.

    e.  Name and address of supplier if appropriate

    f.  Finished Product manufactured if a component is sampled

    g.  Name of Inspectors and Regulatory agency

    h.  Any peculiarities or pertinent observations of the sampling technique (e.g.: floor scrapings, aseptic collection into a sterile container, non-aseptic collection into a sterile container)

6.  The regulatory official should be requested to initial all samples retained by the Factory.

7.    Company's designated representatives must be notified and will provide directions for sending the samples to a testing laboratory.

8.    Selected samples must be properly stored and retained pending results from the inspecting agency's laboratory and authorization from Company.

9.    Company will advise the Co-Packer whether it is necessary to withhold Product or ingredient pending analytical results.

7524713.1

# FIRST ADDENDUM TO CO-PACK AGREEMENT

This First Addendum to a "Co-Pack Agreement" between ADF Foods (USA) Ltd. "ADF" and Ascot Valley Foods LLC (now known as Ascot Valley Foods, Ltd.) "AVF," (ADF and AVF referred to herein as the "Parties") effective as of July 29, 2015, is entered into by the Parties as of this  23  day of April 2018.

**WHEREAS,** the Parties entered into a Co-Pack Agreement as of July 29, 2015; and

**WHEREAS,** the Parties have agreed to revise the terms and conditions of such Co-Pack Agreement;

**NOW, THEREFORE,** the Parties agree that in consideration of the mutual covenants contained herein, the sufficiency of which is acknowledged by both Parties, the following terms and conditions shall be incorporated into the Co-Pack Agreement, notwithstanding anything in the Co-Pack Agreement to the contrary:

1. ADF agrees to terms of net 30 days with an accounts receivable credit limit of $250,000, effective March 15, 2018, for Products (as defined in the Co-Pack Agreement). This credit limit excludes the equipment loan date January 01, 2016.

2. AVF will not accept future Purchase Orders or order ingredients on behalf of ADF unless ADF is in compliance with the terms of the Co-Pack Agreement. If ADF has exceeded its credit limit, AVF will require a prepayment before beginning any production run.

3. Exhibit A to the Co-Pack Agreement shall be revised as of March 15, 2018, to reflect the following prices, F.O.B. AVF's facility as agreed to by ADF in December 2017. These prices will remain in effect through March 15, 2019, unless AVF can demonstrate that the cost to produce specific Products has significantly increased for reasons beyond the control of AVF:

   | | | |
   |---|---|---|
   | a. | Zesty Meatball (Retail) (Nate's) | $13.50 |
   | b. | Classic Meatball (Retail) (Nate's) | $13.00 |
   | c. | Classic Meatball (Bulk) (Nate's) | $15.00 |
   | d. | Classic Meatballs (Trader Joe's) | $35.00 |
   | e. | Mixed Burritos (ALDI) | $13.25 |
   | f. | Mixed Meatless Meatballs Test Launch (ALDI) | $21.00 |
   | g. | Swedish Meatless Meatball – Nate's | $15.50 |
   | h. | Mixed Meatless Meatballs Aldi Special Buy | $19.00 |
   | i. | Nate's Mushroom MB Retail | $ 18.00 |
   | k. | Nate's Mushroom MB Bulk | $ 21.00 |

4. The prices for the items below will only be in effect until July 31, 2018. After this date, AVF will discontinue production of this product. If production continues after this day the price will increase by 50% of price below:
   a. Breakfast Patty — $22.00
   b. Traditional Patty — $23.00
   c. Spicy Southwest Patty — $23.00

5. ADF will pay all invoices via ACH or a similar service agreed to by AVF, effective March 15, 2018.

6. ADF PO Procedure:
   A. ADF will place PO's 45 days prior to the first day of the month of shipment and will give AVF order of priority. AVF will confirm the production schedule within 10 days of receipt of the PO. If AVF changes the production schedule, which results in short supply of products to customers, AVF is responsible for any charges and penalties from the customer as per clause 9 in the original agreement dated July 29, 2015
   B. ADF cannot change a PO unless it gives AVF 45-day notice from the shipment day.

7. ADF agrees that AVF may have a secondary supplier of ingredients for ADF's private label customers. AVF agrees that these ingredients/suppliers must be approved by ADF's private label customers.

8. ADF agrees that AVF can source ingredients from their supplier of choice as long as it meets the specifications, ingredients label, nutritional facts and data only for such ADF products which are exclusively manufactured for the brands Nate's and PJ's.

9. AVF agrees to sell ADF all the burritos listed below at $15/case from March 15 – May 15, 2018. Starting May 16, 2018 the price will be increased to the pricing listed below:
   a. Chicken, Chili & Cheese Burrito (PJ's) — $17.75
   b. Steak & Cheese Burrito (PJ's) — $18.50
   c. Turkey & Egg Burrito (PJ's) — $16.75
   d. Southwest Chicken Burrito (PJ's) — $17.25
   e. Traditional Chicken Burrito (PJ's) — $16.00
   f. Skinny Chicken Burrito (PJ's) — $16.00
   g. Denver Breakfast Burrito (PJ's) — $18.00
   h. Skinny Breakfast Burrito (PJ's) — $18.00

2

i.  Chicken W/ Roasted Peppers Burrito    $17.25
j.  Spicy Pork Chorizo Burrito    $19.50
k.  Chicken Chili Verde Burrito    $16.75
l.  Fire-Roasted Veggie Burrito    $15.50

10. AVF will promptly share the details of the product recipes, nutritional facts, ingredient information including specifications, NOP's, Organic Certificates, USDA approval labels, current certificates for finished products of burritos manufactured for ADF to enable smooth transition to new contract packer to be engaged by ADF. Any delay in providing such information would lead to extension of pricing of $15/case.

*[Intentionally left blank]*

IN WITNESS WHEREOF, the Parties have executed and delivered this First Addendum to Co-Pack Agreement as of the date first written above.

ADF Foods (USA) Ltd.

By: _____

Swathi Rai, VP Finance and Operations

Ascot Valley Foods, Ltd.

By: _____

Brad Ruth, President

3

## SECOND ADDENDUM TO CO-PACK AGREEMENT

This Second Addendum to a "Co-Pack Agreement" between ADF Foods (USA) Ltd. ("ADF") and Ascot Valley Foods LLC (now known as Ascot Valley Foods, Ltd.) ("AVF"), (ADF and AVF referred to herein as the "Parties") is entered into by the Parties as of this 10th day of June 2020.

**WHEREAS**, the Parties entered into a Co-Pack Agreement as of July 29, 2015; and

**WHEREAS,** the Parties entered into a First Addendum to Co-Pack Agreement as of April 23,  2018; and

**WHEREAS,** the Parties have agreed  to revise the terms and conditions of such amended Co-Pack Agreement;

NOW, THEREFORE, the Parties agree that in consideration of the mutual covenants contained herein, the sufficiency of which is acknowledged by both Parties, the following terms and conditions shall be incorporated into the Co-Pack Agreement, notwithstanding anything in the Co-Pack Agreement or the First Addendum to Co-Pack Agreement to the contrary:

1. ADF agrees to the following immediate price increases on the following AVF Products:

|  | Current Price | New Price |
|---|---|---|
| F400FN7704 (Nate's FS Classic Meatballs, 10# Bulk) | 15.00 | 15.80 |
| F400FN7705 (Nate's FS Mushroom Meatballs, 10# Bulk) | 21.00 | 22.25 |
| F400PA55627 (55627 Aldi Meatless Meatballs Test launch) | 21.00 | 21.45 |
| F400PT7301 (Trader Joe's Meatballs) | 35.00 | 36.35 |
| F400RN7205 (Nate's Classic Meatballs) | 13.00 | 14.20 |
| F400RN7206 (Nate's Mushroom Meatballs) | 18.00 | 19.25 |
| F400RN7207 (Nate's Zesty Meatballs) | 13.50 | 14.85 |

These New Prices shall remain in effect for the twelve (12) month period immediately following the date of this Second Addendum to Co-Pack Agreement, and AVF will make best efforts to maintain these New Prices for the balance of 2021; provided, however, that AVF shall not be obligated to maintain these New Prices for the balance of 2021 if the cost to produce such products increases for any reason beyond the control of AVF.

2. AVF will justify any future price increases by documenting any increases in the cost of producing such Products including, without limitation, increases in the cost of  ingredients, labor, packaging, utilities, manufacturing materials (i.e. cooking oil, liquid nitrogen, etc.), taxes, lease costs (facility, equipment, trucks, etc.), or any other cost component.

3. AVF will arrange for the payment to ADF of its outstanding equipment loan in the amount of One Hundred Forty-nine Thousand Dollars ($149,000) within two (2) business days of the date of this Second Addendum to Co-Pack Agreement.

4.     AVF acknowledges that it has no outstanding claims against ADF (except existing Accounts Receivable) as of the date of this Second Addendum to Co-Pack Agreement.

IN WITNESS WHEREOF, the Parties have executed and delivered this Second Addendum to Co-Pack Agreement as of the date first written above.

ADF Foods (USA), Ltd.

By: _____

Bimal Thakkar, President

(ADF's covering e-mail dated June 11, 2020 forms part of this Addendum)

Ascot Valley Foods, Ltd.

By: _____

Robert J. Zab, President

2

# EXHIBIT B

10/29/2016

Ascot Valley Foods, LLC
502 Ascot Parkway
Cuyahoga Falls, OH 44223

ADF Foods (USA), Ltd.
S Claremont Street #108
San Mateo, CA 94402

RE:   CONSENT TO ASSIGN CO-PACK AGREEMENT

Dear Mr. Thakkar,

Pursuant to that certain Co-Pack Agreement (the "Agreement") by and between ADF Foods (USA),
Ltd. ("Company") and Ascot Valley Foods, LLC ("Co-Packer"), a copy of which is enclosed herein,
Co-Packer requests that Company, pursuant to Paragraph 30 of the Agreement, consent to Co-
Packer's assignment of the entirety of its rights and obligations under the Agreement to AVF
Holdings LLC ("Assignee").

Please understand that Assignee has not agreed to assume any current obligations of Co-Packer,
including for past amounts due.

To acknowledge your consent, please sign where indicated below and return a copy of this letter to
Co-Packer, c/o Keith A. Kropp, President and CEO.

Should you have any questions, please do not hesitate to contact me directly at
kkropp@ascotvalleyfoods.com or 330-606-0870.

Sincerely,


Keith A. Kropp

CEO

On behalf of Company, I hereby consent to the requested assignment.

ADF Foods (USA), Ltd.

BY:   _____

ITS:   _____   BIMAL THAKKAR
                                  MANAGING DIRECTOR

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (**"Agreement"**), is entered into on the 11th day of November, 2016, by and between AVF Holdings LLC, an Ohio limited liability company (**"Buyer"**) Ascot Valley Foods LLC, an Ohio limited liability company (**"Company"**); Ranger Akron LLC, an Ohio limited liability company (**"Seller"**);   ROBERT J. SHEARER, whose address is 6451 Doral Drive N.W., Canton, OH  44718 (**"Shearer"**); KEITH A. KROPP, whose address is 957 Johnston Street, Akron, Ohio 44306 (**"Kropp"**) and KS Properties of Akron LLC (**"KS Properties"**).

## R E C I T A L S:

A.     Company is engaged in the business of manufacturing and distributing frozen appetizers and other food products and services to the food industry (the **"Business"**).

B.     Company desires to consent to Seller at a secured party sale to sell AS-IS, WHERE-IS, and Buyer desires to buy AS-IS, WHERE-IS, substantially all of the assets used in the operation of the Business, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants, agreements, representations and warranties and conditions contained in this Agreement, the parties hereto agree as follows:

## ARTICLE 1

## SALE AND PURCHASE OF ASSETS AND ASSUMPTION OF LEASE

**Section 1.1     Purchased Assets**.   On the terms and subject to the conditions contained herein, with the consent of Company, Seller agrees to sell AS-IS, WHERE-IS to Buyer, and Buyer agrees to purchase AS-IS, WHERE-IS from Seller, at a properly noticed secured party sale to be held in accordance with Article 9 of the Uniform Commercial Code as adopted in Ohio, at the Closing and on the Closing Date (as each term is defined in Section 10.1), free and clear of all liens, claims and encumbrances (except as otherwise disclosed in and permitted by this Agreement) all of Company's right, title and interest in and to all of its assets, properties, goodwill and rights of every nature, kind and description, tangible and intangible, wherever situated and whether or not carried on or reflected on the books and records of Company and used by Company in connection with the Business except as specifically excluded herein (collectively, the **"Purchased Assets"**).   The Purchased Assets shall include, but not be limited to, those assets set forth on **Schedule 1.1**.

8845482.7

# EXHIBIT C



*jgorski@smdklaw.com*

October 11, 2021

**VIA EMAIL: swathi@adf-foods.com**
**AND FEDEX**

ADF Foods (USA) Ltd.
800 S. Claremont Street
San Mateo, California 94402

Attn: Swathi Rai, Vice President of Finance/Operations

> Re: Co-Pack Agreement effective July 29, 2015 between ADF Foods (USA) Ltd. ("ADF") and Ascot Valley Foods, Ltd. ("Ascot") (as subsequently amended, the "Agreement")

Dear Ms. Rai:

The undersigned and this firm represent Ascot in connection with the above-referenced Agreement. All capitalized terms used but not otherwise defined in this letter shall have the meanings ascribed to such terms in the Agreement. This letter shall serve as notice on behalf of Ascot to ADF that ADF's purchase orders during the Term year July 29, 2020 – July 28, 2021 failed to specify quantities of Product at least equal to the Minimum Commitment for such year, as required under Section 2 of the Agreement. Specifically, ADF purchased 166,445 total cases during the prior Term year, less than the required Minimum Commitment amount of 200,000 total cases. Enclosed is a schedule showing the number of cases purchased by ADF during this period.

Ascot is sending ADF this written notice and the enclosed invoice for the purchase shortfall in the amount of $821,761.95 (33,555 cases multiplied by the weighted average case price of $24.49). Pursuant to Section 2, this notice creates a binding obligation on ADF to pay for the balance of ADF's Minimum Commitment.

Please cause ADF to issue payment to Ascot on the enclosed Minimum Quantity invoice, immediately. In the event ADF fails to issue payment on these invoices within ten (10) days after the date of this notice, Ascot will pursue all of its rights and remedies



ADF Foods (USA) Ltd.
October 11, 2021
Page 2

available under the Agreement and at law, including terminating the Agreement pursuant to Section 16(a) of the Agreement.

Thank you for your immediate attention to this matter.

Very truly yours,

Jeffrey A. Gorski

Encl.

cc:     Robert Zab (via email bob.zab@manchesterrbg.com)
        Bimal Thakkar (via email bimaltravel@adf-foods.com)

| adf foods | | | 07/29/20 - 07/28/21 | | |
|---|---|---|---|---|---|
| | | | cases | dollars | avg cs price |
| | 1100 | Nate's Zesty Meatball | 2,646 | 39,293.10 | 14.85 |
| | 1101 | Nate's Classic Meatball (Retail) | 1,419 | 20,149.80 | 14.20 |
| | 1102 | Nate's Classic Meatball (Bulk) | 1,066 | 16,842.80 | 15.80 |
| | 1103 | Nate's Mushroom Meatball (Retail) | 765 | 14,726.25 | 19.25 |
| | 1104 | Nate's Mushroom Meatball (Bulk) | 1,022 | 22,739.50 | 22.25 |
| | 1126 | Trader Joe's Classic Meatball | 36,700 | 1,334,045.00 | 36.35 |
| | 1133 | Aldi Meatball (Mixed) | 122,827 | 2,627,635.73 | 21.39 |
| | | | 166,445 | 4,075,432.18 | 24.49 |

**Ascot Valley Foods LTD**
205 Ascot Parkway
Cuyahoga Falls, OH  44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

BILL TO
ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

INVOICE # 2479
DATE 10/11/2021
DUE DATE 11/10/2021
TERMS Net 30

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| Customer Chargeback<br>Case shortfall for period 07/29/20 – 07/28/21 | 33,555 | 24.49 | 821,761.95 |

BALANCE DUE   **$821,761.95**

# EXHIBIT D



*jgorski@smdklaw.com*

October 22, 2021

**VIA EMAIL: swathi@adf-foods.com**
**AND FEDEX**

ADF Foods (USA) Ltd.
800 S. Claremont Street
San Mateo, California 94402

Attn: Swathi Rai, Vice President of Finance/Operations

   Re: Co-Pack Agreement effective July 29, 2015 between ADF Foods (USA)
     Ltd. ("ADF") and Ascot Valley Foods, Ltd. ("Ascot") (as subsequently
     amended, the "Agreement")

Dear Ms. Rai:

    As you are aware, I sent ADF notice of the Minimum Quantity payment
obligation under Section 2 of the Agreement on October 11, 2021. To date, Ascot has
not received full payment on the amounts outstanding. As a result, Ascot has elected to
terminate the Agreement pursuant to Section 16(a) of the Agreement. Please be advised
that, unless otherwise agreed to by Ascot in writing, the Agreement will terminate and be
of no further force or effect ninety (90) days from the date of this letter, January 20, 2022.

    This letter shall also serve as notice pursuant to Section 16(a) of the Agreement,
of ADF's failure to pay the following invoices that are now past due:

(1) Invoice No. 2424 with a due date of 10/07/21 and a balance due of $744.46

(2) Invoice No. 2428 with a due date of 10/10/21 and a balance due of $23,627.50

(3) Invoice No. 2433 with a due date of 10/14/21 and a balance due of $29,080.00

Please make payment of these invoices within ten (10) days, failing which Ascot shall
avail itself of its rights and remedies under the Agreement, under law or in equity.

    Ascot will consider continuing the supply relationship with ADF on Ascot's
current form Co-Pack Agreement. Enclosed is an Amended and Restated Co-Pack



**SINGERMAN MILLS**
**DESBERG & KAUNTZ co.**
EXPERIENCE... PEACE OF MIND

ADF Foods (USA) Ltd.
October 22, 2022
Page 2

Agreement for this purpose, along with the referenced Attachment A.  Please contact me or Bob Zab of Ascot if you would like to discuss this alternative to terminating the Agreement.  Please note, however, that the new Co-Pack Agreement will provide for the price increase previously discussed by the parties, will not grant ADF an accounts receivable "credit", and will shorter payment terms.

Thank you for your immediate attention to this matter.

Very truly yours,

Jeffrey A. Gorski

Encl.

cc:     Robert Zab (via email bob.zab@manchesterrbg.com)
        Bimal Thakkar (via email bimaltravel@adf-foods.com)

# EXHIBIT E



*jgorski@smdklaw.com*

January 21, 2022

**VIA EMAIL: swathi@adf-foods.com**
**AND FEDEX**

ADF Foods (USA) Ltd.
800 S. Claremont Street
San Mateo, California  94402

Attn:  Swathi Rai, Vice President of Finance/Operations

> Re:   Co-Pack Agreement effective July 29, 2015 between ADF Foods (USA) Ltd.
> ("ADF") and Ascot Valley Foods, Ltd. ("Ascot") (as subsequently amended, the
> "Agreement")

Dear Ms. Rai:

As provided in my letter to ADF dated October 22, 2021, the above-referenced Agreement has terminated effective January 20, 2022.  To date, Ascot has not received payment on the outstanding invoices itemized on the enclosed schedule.  In addition, ADF is obligated under the Agreement to reimburse Ascot for the cost of unique raw materials and packaging purchased by Ascot on behalf of ADF, in the amount of $365,429.08.  Enclosed are copies of all of the outstanding invoices.  The total amount now due and payable is $1,287,897.99.

My understanding is that the parties continue to discuss a possible transition and settlement agreement that would, among other things, resolve the outstanding invoices.  Please be advised that such discussions are for settlement purposes only.  In the event the parties are not able to enter into a definitive transition and/or settlement agreement promptly, Ascot shall have no alternative other than to pursue its rights and remedies available under the Agreement, under law or in equity.

Thank you for your immediate attention to this matter.

Very truly yours,

Jeffrey A. Gorski

Encl.
cc:   Hari Samaroo, Esq. (via email hari@hksamaroo.com)
Robert Zab (via email bob.zab@manchesterrbg.com)
Bimal Thakkar (via email bimaltravel@adf-foods.com)

**ADF Foods - Outstanding Invoices**

| Inv # | Amount | Description | Due Date |
|-------|--------|-------------|----------|
| 2424 | 744.46 | Trader Joe's Classic Meatball | 10/7/2021 |
| 2428 | 23,627.50 | Trader Joe's Classic Meatball | 10/10/2021 |
| 2433 | 29,080.00 | Trader Joe's Classic Meatball | 10/14/2021 |
| 2451 | 21,810.00 | Trader Joe's Classic Meatball | 10/29/2021 |
| 2468 | 25,445.00 | Trader Joe's Classic Meatball | 11/12/2021 |
| 2479 | 821,761.95 | Case Shortfall (07/29/20 - 07/28/21) | 11/10/2021 |
| 2831 | 365,429.08 | Raw Material & Packaging | 1/20/2022 |

| | 1,287,897.99 | Total |

**Ascot Valley Foods LTD**

205 Ascot Parkway
Cuyahoga Falls, OH  44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

**BILL TO**
ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

**INVOICE #** 2424
**DATE** 08/23/2021
**DUE DATE** 10/07/2021
**TERMS** Net 45

**SHIP DATE**
08/23/2021

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **1126**<br>C7911 - Trader Joe's Classic Meatball | 1,000 | 36.35 | 36,350.00 |

| | | |
|---|---|---|
| PAYMENT | | 35,605.54 |
| BALANCE DUE | | **$744.46** |

**Ascot Valley Foods LTD**
205 Ascot Parkway
Cuyahoga Falls, OH  44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

**BILL TO**
ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

**INVOICE #** 2428
**DATE** 08/26/2021
**DUE DATE** 10/10/2021
**TERMS** Net 45

**SHIP DATE**
08/26/2021

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **1126**<br>C7911 - Trader Joe's Classic Meatball | 650 | 36.35 | 23,627.50 |

BALANCE DUE

# $23,627.50

**Ascot Valley Foods LTD**

205 Ascot Parkway
Cuyahoga Falls, OH  44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

**BILL TO**

ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

**INVOICE #** 2433
**DATE** 08/30/2021
**DUE DATE** 10/14/2021
**TERMS** Net 45

**SHIP DATE**
08/30/2021

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **1126**<br>C7911 - Trader Joe's Classic Meatball | 800 | 36.35 | 29,080.00 |

| | | |
|---|---|---|
| BALANCE DUE | | **$29,080.00** |

**Ascot Valley Foods LTD**

205 Ascot Parkway
Cuyahoga Falls, OH 44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

**BILL TO**
ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

**INVOICE #** 2451
**DATE** 09/14/2021
**DUE DATE** 10/29/2021
**TERMS** Net 45

**SHIP DATE**
09/14/2021

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **1126**<br>C7911 - Trader Joe's Classic Meatball | 600 | 36.35 | 21,810.00 |

BALANCE DUE

**$21,810.00**

**Ascot Valley Foods LTD**
205 Ascot Parkway
Cuyahoga Falls, OH  44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

**BILL TO**
ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

**INVOICE #** 2468
**DATE** 09/28/2021
**DUE DATE** 11/12/2021
**TERMS** Net 45

**SHIP DATE**
09/28/2021

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **1126**<br>C7911 - Trader Joe's Classic Meatball | 700 | 36.35 | 25,445.00 |

| | BALANCE DUE | **$25,445.00** |
|---|---|---|

**Ascot Valley Foods LTD**
205 Ascot Parkway
Cuyahoga Falls, OH  44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

**BILL TO**
ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

**INVOICE #** 2479
**DATE** 10/11/2021
**DUE DATE** 11/10/2021
**TERMS** Net 30

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Customer Chargeback**<br>Case shortfall for period 07/29/20 – 07/28/21 | 33,555 | 24.49 | 821,761.95 |

BALANCE DUE

# $821,761.95

**Ascot Valley Foods LTD**
205 Ascot Parkway
Cuyahoga Falls, OH  44223 US
mdangelo@ascotvalleyfoods.com

# INVOICE

**BILL TO**
ADF Foods
800 South Claremont St.
Suite 108
San Mateo CA 94402

**INVOICE #** 2831
**DATE** 01/20/2022
**DUE DATE** 01/20/2022
**TERMS** Due on receipt

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| Inventory<br>Seasoning - Zesty Italian Meatball (510004) | 10,983 | 3.57 | 39,209.31 |
| Inventory<br>Aldi Meatless Meatball - Master Case (900040) | 29,749 | 0.57 | 16,956.93 |
| Inventory<br>Aldi Classic - Bag (920042) | 372,285 | 0.10 | 37,228.50 |
| Inventory<br>Aldi Zesty - Bag (920043) | 313,177 | 0.10 | 31,317.70 |
| Inventory<br>Aldi Meatless Meatball - MC Lid (940040) | 27,508 | 0.48 | 13,203.84 |
| Inventory<br>Classic Seasoning - Trader Joe's (510075) | 26,349 | 3.37 | 88,796.13 |
| Inventory<br>Trader Joe's - Master Carton (900009) | 17,850 | 0.75 | 13,387.50 |
| Inventory<br>Trader Joe's Classic Meatball - Bag (920029) | 427,840 | 0.10 | 42,784.00 |
| Inventory<br>Nate's 12 Pack - Master Carton (900007) | 4,608 | 0.38 | 1,751.04 |
| Inventory<br>Nate's Classic Meatball - Bag (920019) | 28,800 | 0.19 | 5,472.00 |
| Inventory<br>Nate's Mushroom Metaball - Bag (920020) | 26,000 | 0.19 | 4,940.00 |
| Inventory<br>Nate's Zesty Meatball - Bag (920021) | 28,327 | 0.19 | 5,382.13 |
| Inventory<br>Seasoning Unique Raw Ingredients | 1 | 65,000.00 | 65,000.00 |

BALANCE DUE **$365,429.08**

# EXHIBIT F

**From:** Jeff Gorski
**Sent:** Monday, October 11, 2021 11:58 AM
**To:** swathi@adf-foods.com; bimaltravel@adf-foods.com; 'Bob Zab' <bob.zab@manchesterrbg.com>
**Subject:** Ascot Valley Foods Ltd.

Ms. Rai, attached please find my correspondence being sent on behalf of our client, Ascot Valley Foods, Ltd.

**Jeffrey A. Gorski, Esq.**
Singerman, Mills, Desberg & Kauntz Co., L.P.A.
3333 Richmond Road, Suite 370
Cleveland, OH 44122
**e.**  jgorski@smdklaw.com   **p.**  216.292.5807     **d.** 216.455.1665
**w.** smdklaw.com            **f.**  216.292.5867



*CONFIDENTIALITY NOTE: THE INFORMATION IN THIS E-MAIL AND ANY ATTACHMENTS IS SENT BY AN ATTORNEY OR HIS/HER AGENT, AND IS INTENDED TO BE CONFIDENTIAL AND FOR USE BY THE INTENDED RECIPIENT ONLY. THE INFORMATION MAY BE PROTECTED BY ATTORNEY/CLIENT PRIVILEGE, WORK PRODUCT IMMUNITY OR OTHER LEGAL RULES. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE NOTIFIED THAT THE RETENTION, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU RECEIVE THIS E-MAIL IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY RETURN E-MAIL OR BY TELEPHONE AT (216) 292-5807 AND IMMEDIATELY DELETE THIS MESSAGE AND ALL ATTACHMENTS. THANK YOU.*

# EXHIBIT G

**From:** Andrea Linen <alinen@smdklaw.com>
**Sent:** Friday, October 22, 2021 10:48 AM
**To:** swathi@adf-foods.com
**Cc:** bob.zab@manchesterrbg.com; bimaltravel@adf-foods.com; Jeff Gorski <jgorski@smdklaw.com>
**Subject:** NEW ADF CO-PACK AGREEMENT AND RELATED ATTACHMENT A


Good Morning Ms. Rai,

This electronic communication is being sent at the request of Attorney Jeffrey A. Gorski, you
will also receive this communication via Federal Express.  Please review the attached
documents, if you have any questions or concerns, you can reach our office at (216) 292-5807.


**Thank you,**
**Andrea Linen**
Legal Assistant to Jeffrey A. Gorski, Stephen L. Byron and
Jacqueline A. Hoelting-Van De Merwe
Singerman, Mills, Desberg & Kauntz Co., L.P.A.
3333 Richmond Road, Suite 370
Cleveland, OH 44122
**e.**  alinen@smdklaw.com  **p.**  216.292.5807
**w**. smdklaw.com          **f.**  216.292.5867



*CONFIDENTIALITY NOTE: THE INFORMATION IN THIS E-MAIL AND ANY ATTACHMENTS IS SENT BY AN
ATTORNEY OR HIS/HER AGENT, AND IS INTENDED TO BE CONFIDENTIAL AND FOR USE BY THE
INTENDED RECIPIENT ONLY. THE INFORMATION MAY BE PROTECTED BY ATTORNEY/CLIENT
PRIVILEGE, WORK PRODUCT IMMUNITY OR OTHER LEGAL RULES. IF THE READER OF THIS MESSAGE
IS NOT THE INTENDED RECIPIENT, YOU ARE NOTIFIED THAT THE RETENTION, DISSEMINATION,
DISTRIBUTION OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU RECEIVE THIS E-MAIL
IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY RETURN E-MAIL OR BY TELEPHONE AT (216) 292-5807
AND IMMEDIATELY DELETE THIS MESSAGE AND ALL ATTACHMENTS. THANK YOU.*

# EXHIBIT H

**From:** Jeff Gorski
**Sent:** Friday, January 21, 2022 4:58 PM
**To:** swathi@adf-foods.com; bimaltravel@adf-foods.com; Hari Samaroo <hari@hksamaroo.com>
**Cc:** 'Bob Zab' <bob.zab@manchesterrbg.com>; Ronald Dees <rwdees@gmail.com>; 'rproch@zircoa.com' <rproch@zircoa.com>
**Subject:** Ascot Valley Foods/ADF Foods (USA) Ltd.

Attached please find my correspondence and referenced enclosures regarding the terminated Co-Pack Agreement.

Jeff Gorski

**Jeffrey A. Gorski, Esq.**
Singerman, Mills, Desberg & Kauntz Co., L.P.A.
3333 Richmond Road, Suite 370
Cleveland, OH 44122
**e.** jgorski@smdklaw.com  **p.**  216.292.5807    **d.** 216.455.1665
**w**. smdklaw.com      **f.**  216.292.5867



*CONFIDENTIALITY NOTE: THE INFORMATION IN THIS E-MAIL AND ANY ATTACHMENTS IS SENT BY AN ATTORNEY OR HIS/HER AGENT, AND IS INTENDED TO BE CONFIDENTIAL AND FOR USE BY THE INTENDED RECIPIENT ONLY. THE INFORMATION MAY BE PROTECTED BY ATTORNEY/CLIENT PRIVILEGE, WORK PRODUCT IMMUNITY OR OTHER LEGAL RULES. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE NOTIFIED THAT THE RETENTION, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU RECEIVE THIS E-MAIL IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY RETURN E-MAIL OR BY TELEPHONE AT (216) 292-5807 AND IMMEDIATELY DELETE THIS MESSAGE AND ALL ATTACHMENTS. THANK YOU.*