UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASCOT VALLEY FOODS, LTD., | 22 Civ. 2655 |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| ADF FOODS (USA), LTD., | |
| Defendant. | |

DALE E. HO, United States District Judge:

This case stems from a dispute over the production (or lack thereof) of meatless meatballs, which Plaintiff Ascot Valley Foods, Ltd. ("Plaintiff," "Ascot," or "Ascot Valley") agreed to manufacture, package, and ship to Defendant ADF Foods (USA), Ltd. ("Defendant" or "ADF"). Ascot Valley brings claims under New York law for breach of contract, promissory estoppel, and account stated. ADF brings several counterclaims, alleging damages from unfulfilled purchase orders and misappropriation of trade secrets stemming from Ascot Valley's production of similar meatless meatballs for other customers.

After a two-day bench trial, the Court finds that Ascot Valley, with the exception of its claim stemming from non-payment for goods actually received, failed to prove its claims. The Court further finds that ADF has proven its counterclaim for misappropriation of its meatless meatball recipes by Ascot Valley and is entitled to damages on that claim, but that it has not proven its counterclaim with respect to unfulfilled purchase orders. The Court herby issues its findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.    The Parties

1.    ADF is a Delaware Corporation. Complaint ("Compl.") ¶ 3, ECF No. 1, PX-1.

2.      Ascot Valley Foods, Ltd. is an Ohio limited liability company.  Compl. ¶ 2.

3.      ADF is a distributor of food products to supermarkets and other food sellers.  Direct Testimony of Bimal Thakkar ("Thakkar Aff.") ¶ 2.

4.      ADF was formed in 2010 when it acquired a business called Elena's Food Specialties ("Elena's").  *Id.*  As part of the transaction with Elena's, ADF acquired a manufacturing facility in San Francisco.  *Id.*  ADF manufactured a variety of food products including burritos, meatless meatballs, and burger patties at that facility for sale primarily to distributors, supermarkets and other retailers in the United States.  *Id.*  ADF's customers included Whole Foods, Kroger, Trader Joe's and various distributors to supermarkets such as Safeway, New Seasons and Fresh Market.  Deposition Transcript of Swathi Rai ("Rai Dep.") 39:13-25; 40:20-25.

## II.     The Co-Pack Agreement

5.      In 2014, a representative of Ascot Valley Foods, LLC ("AVF") contacted ADF offering AVF's services as a co-packer.  Thakkar Aff. ¶ 3.  A co-packer is a manufacturer that provides manufacturing services to companies that distribute and sell products.  *Id.*  ADF's factory lease in a high-tech area was expiring in 2015 and it was looking at several options, including setting up a new factory elsewhere or entering into a co-packing arrangement.  *Id.*

6.      As part of the discussions between AVF and ADF, AVF's then-owners, Keith Kropp and Bob Shearer, visited ADF's factory in San Francisco to see how it manufactured the products and to inspect the equipment.  Thakkar Aff. ¶ 4; Deposition Transcript of Keith Kropp ("Kropp Dep.") 12:20-13:7; 14:6-11.

7.      Effective July 29, 2015, ADF and Ascot Valley Foods, LLC ("AVF") entered into a Co-Pack Agreement for AVF to manufacture, package and ship various frozen food products for ADF (the "Agreement"). *See* Co-Pack Agreement, PX-4; Thakkar Aff. ¶ 6.

8.      Specifically, Section 1 of the Agreement states, in part:

2

> Subject to the terms and conditions hereof, during the term of this Agreement, Co-Packer agrees to manufacture, produce, package, store, pick for shipment and stage for shipment for, and sell to, Company, and Company agrees to purchase from Co-Packer, the products listed in Exhibit A attached hereto (the "Products") on a product-by-product basis as Company shall reasonably request.

Co-Pack Agreement ¶ 1; Thakkar Aff. ¶ 7.

9.      On November 11, 2016, Ascot purchased the assets of AVF, and AVF assigned the Agreement to Ascot (the "Assignment").   Compl. ¶ 20.   All of AVF's records, recipes and equipment were transferred to Ascot.  Kropp Dep. 42:23-43:2; 49:24-50:16.

10.      On April 23, 2018, Ascot and ADF entered into the First Addendum to the Agreement.  PX-5.

11.      On June 10, 2020, Ascot and ADF entered into the Second Addendum to the Agreement.  PX-6.

**III.      Transition of Manufacturing from ADF to AVF**

12.      To facilitate the Agreement, ADF sold AVF equipment from its factory, transferred the recipes for the products and showed AVF how to make them.  Thakkar Aff. ¶ 5.  AVF had never made any of the products listed on Exhibit A of the Agreement and did not have recipes for them.  Kropp Dep. 21:9-18.  ADF sent AVF its recipes, cooking instructions, and materials suppliers for the products. *Id.* 21:19-22:3; 29:25-31:11; 31:22-25; 33:5-34:7; 49:24-51:16; 51:23-52:6; 54:7-55:7.

13.      After the parties entered into the Agreement on July 29, 2015, it took AVF a long time to actually start production.  Thakkar Aff. ¶ 10.  For example, the equipment was not delivered until September 17, 2015.  DX-4; Kropp Dep. 26:20-27:21.  ADF also sent production personnel from its San Francisco plant to help AVF learn how to make recipes.  Thakkar Aff. ¶ 10; Kropp Dep. 37:16-38:7.

3

14.     Exhibit A to the Agreement listed 28 products that Ascot agreed to make for ADF, including 12 types of burritos, 6 meatballs, 4 falafels, 2 naanzzas, 2 burgers, a breakfast patty and kibbehs.  Co-Pack Agreement at 13.  Except for the falafels, which were a new ADF product, ADF had been already making all the products listed in Exhibit A in its San Francisco facility.  Thakkar Aff. ¶ 8.  At the time the production switched from the San Francisco facility to AVF, burritos accounted for about 70% of the products ADF sold.  *Id.*

15.     Once the transition was complete, AVF manufactured all the products listed in Exhibit A of the Agreement, except falafels, nananzza, and kibbehs.  Aff ¶ 10.

16.     Because AVF agreed to manufacture 28 products for ADF, ADF agreed to a minimum number of cases that ADF would be expected to order every year after production commenced.  Thakkar Aff. ¶ 9.  Specifically, Section 2 of the Agreement states, in part:

> The annual minimum order volume for Product to be ordered by Company from Co-Packer is 200,000 total cases in each year (12 month  period  from inception) of the Term of this Agreement ("Minimum Commitment").  For any Renewal Term, agreed upon minimum  volume  requirements  will be mutually negotiated by Parties, provided, however, that if the Parties fail to agree upon new minimums, the current Minimum Commitment requirements shall remain in place … Notwithstanding the foregoing, if Company's purchase orders, in the aggregate as of the end of any year during the Term or Renewal Term, as applicable, fail to specify quantities of Product at least equal to the Minimum Commitment for such year as provided in this Section 2, Co-Packer, in its sole discretion, may send Company a written notice (including an invoice) of its purchase shortfall, which notice will create a binding obligation on Company to purchase or pay for the balance of Company's Minimum Commitment.

Co-Pack Agreement ¶ 2.

## IV.    Production and Pricing Issues

17.     From the time AVF began making products for ADF, there were significant issues with production, including scheduling, raw materials acquisition, and output quality.  Thakkar Aff. ¶ 10; Rai Dep. 45:9-47:11.  In October 2016, a group of investors purchased AVF from Mr. Kropp

4

and Mr. Shearer and renamed the company Ascot Valley Foods, Ltd ("Ascot").  Thakkar Aff. ¶ 11.  The new Ascot owners promised to improve the operations, but the foregoing problems persisted.  *Id.*; Rai Dep. 45:9-47:11.  ADF ended up losing significant business because AVF and Ascot could not fulfill orders or delivered product that did not meet the quality standards required.  Thakkar Aff. ¶ 11; Rai Dep. 49:9-23; 53:6-23.  This included losing Costco and Whole Foods as customers.  Thakkar Aff. ¶ 11; Rai Dep. 49:9-23; 53:6-23.

18.    ADF would have ordered more products from AVF and Ascot, but often Ascot was unable to meet demand because of missing ingredients or production problems.  Thakkar Aff. ¶ 12; Rai Dep. 46:16-47:11; 53:6-23; *see also* Trial Cross Examination of Robert Zab ("Zab Cross"), 32:20-33:13 (Ascot lacked sufficient raw materials to produce ADF's products in Fall 2021); 94:12-96:11 (same).  ADF attempted to assist Ascot by advancing funds to allow them to make the products ADF had ordered.  Thakkar Aff. ¶ 12.

19.    In those first few years of the Co-Pack Agreement, ADF never ordered 200,000 cases of product, and Mr. Thakkar testified to his belief that the parties understood that the minimum requirement had been waived.  Thakkar Aff. ¶ 12.  At trial, Mr. Zab testified that, to his knowledge, the Minimum Commitment was never discussed with ADF during the entire six-year term of the Agreement, and he also confirmed that he had no idea whether, prior to 2020, the Minimum Commitment was ever met.  Zab Cross, Tr. 33:10-34:3; 67:24-68:1; 92:11-15.

20.    Exhibit A to the Agreement included the cost per unit that AVF would charge ADF.  Co-Pack Agreement at 13; Thakkar Aff. ¶ 13.  The price for each product was an important part of the Agreement.  Thakkar Aff. ¶ 13.  Recognizing that costs of ingredients and packaging might change, the parties included a provision on how prices could be increased during the term of the Agreement:

Prices.  The prices for the Products shall be as set forth in Exhibit A. The price per case must

5

be detailed and include Material cost, handling upcharge and conversion cost. Upon request of the Company, Co-Packer will provide documentation of Materials costs including source and in-bound freight.  The Parties shall review Material Costs once every six (6) months to adjust for increases or decreases in the cost of raw materials and packaging materials of the Products. Any pricing adjustment request shall be sent to Company in writing with detailed supporting information showing the change in costs. Company shall have the right, in its sole discretion, to request additional supporting information. All pricing adjustments shall become effective only upon written agreement of the parties and ninety (90) days thereafter. So long as Co-Packer's request was reasonable and was supported by the requisite information as provided above, if the Parties are unable to agree on any such pricing adjustment, Co-Packer, upon notice to Company, may terminate this Agreement, at which time the Co-Packer will continue to honor the terms of the Agreement up to six (6) months, affording the Company sufficient opportunity to find an alternate co-packer.  Upon finalizing any pricing adjustments, the Parties will use their best efforts to revise Exhibit A accordingly.

Co-Pack Agreement ¶ 8.

21.    Although the Agreement had a set procedure for prices increases, Ascot refused to provide the "detailed supporting information showing the change in costs" in connection with price increases.  *See* Zab Cross, Tr. 41:20- 42:1 (confirming his understanding that the Agreement required price increases to be justified with documentation supporting the increase).

22.    Mr. Zab confirmed at trial that, for example, the letter Ascot sent to ADF identifying its price increase demand for January 1, 2022 failed to comply with the requirement that any price increases be "sent to [ADF] in writing with detailed supporting information showing the change in costs." Zab Cross, Tr. 49:3-5.[1]  Instead of supporting its request for price increases based upon "detailed information showing the change in costs," the price increases Ascot demanded were driven by its desire to maintain – *or increase* – its profit margins. Zab Cross, Tr. 44:25-49:5.

---

[1] Though Mr. Zab initially testified that Ascot provided detailed written support for price increases either "most of the time," *id.*, 42:2-5, or "every single time," *id.*, 43:2-7, once confronted with his deposition testimony, he conceded that Ascot had not complied with the requirement to support price increases with detailed supporting information. *Id.* 49:3-5.

23.     Ascot's failure to follow the required price increase process was most pronounced for the 12 types of burritos that Ascot made for ADF.  The Court credits testimony from Mr. Thakkar that Ascot had significant difficulties making the contracted burritos and did not want to continue providing them to ADF.  Thakkar Aff. ¶ 14; Rai Dep. 58:11-18.  Instead of following the agreed-upon procedure for price increases, Ascot told ADF in early 2018 that it would stop making the burritos unless ADF agreed to price increases of 41-77%.  Thakkar Aff. ¶ 14; Zab Cross, Tr. 26:7-18 (explaining that if ADF could not pay the new price, Ascot told them "you could leave if you want").  The Court credits testimony that such a price increase would make the burritos unsellable to retailers.  Thakkar Aff. ¶ 14; Rai Dep. 59:16-25.

24.     Mr. Thakkar also testified that ADF could have moved burrito production to another co-packer, but that such a process takes a long time.  To switch co-packers, the company must (i) reach an agreement with the new co-packer, (ii) transfer the recipes, (iii) teach the new co-packer the techniques required to make the products, (iv) test the products for quality and (v) obtain approvals from the customers.  This can take more than six months to accomplish.  Thakkar Aff. ¶ 15; Rai Dep. 60:5-16.

25.     Instead of moving production to another co-packer right away, ADF entered into the First Addendum to the Agreement between Ascot and ADF on April 23, 2018.  PX-5.  Ascot continued to make burritos for ADF for a short period before they ceased production and ADF moved to another co-packer.  Thakkar Aff. ¶ 16; Rai Dep. 60:1-16.

26.     Even after Ascot stopped making burritos, ADF continued to have problems getting a consistent supply of product from Ascot, and Ascot continued to push ADF for price increases without supporting documentation as required in the Agreement.  Thakkar Aff. ¶ 17.

27.     In the spring of 2020, Ascot again requested changes to the Agreement to raise prices, and the parties entered into a Second Addendum.  PX-6; Thakkar Aff. ¶ 18.  By the time

the parties signed the Second Addendum, Ascot was making only 7 products for ADF, all meatless meatballs. Thakkar Aff. ¶ 18. ADF sold these meatballs under the branding of "Nates." Thakkar Aff. ¶ 20. In addition to raising the prices for the meatless meatballs, the Second Addendum (i) renewed Ascot's obligation to justify any future price increases by documenting the reasons for the increase, (ii) required Ascot to pay off the loan ADF had provided for the equipment it transferred when it moved production from San Francisco, and (iii) confirmed that Ascot had no existing claims against ADF. *Id.* ¶ 18.

28.     Based on the above, the Court finds that Ascot Valley was simply incapable of meeting its obligations to produce the products listed in Exhibit A of the original Co-Pack Agreement.

**V.     ADF Discovers Ascot's Exclusivity and Intellectual Property Breaches**

29.     In August 2021, Swathi Rai, ADF's Vice President for Operations, discovered meatless meatballs being sold in a Lidl Supermarket that looked just like the meatballs Ascot made for ADF for resale to Aldi and under ADF's own brand, Nates. Rai Dep. 86:18-87:25; Thakkar Aff. ¶ 20. As a result, she sent Ascot the following email:

> Please see the attached images of the Lidl meatless meatballs under their private label brand. They look exactly like the Meatballs we make for Aldi. Their names and the packing are the same as our Aldi and Nate's Meatless Meatballs.
>
> I hope you are not making these meatballs for Lidl. The recipe and technology for these meatballs were shared with you in confidentiality to make these meatballs for our customers.
>
> Please let me know at the earliest if you are making these items for Lidl.

DX-25; *see also* Rai Dep. 85:15-18; 85:24-86:2; 86:18-87:25; Thakkar Aff. ¶ 20. Ascot replied that it would not provide any information about other clients. DX-25; Rai Dep. 92:14-21.

30.     The Agreement has several provisions that protect ADF's business and intellectual property and requires that Ascot not make or sell the products it makes for ADF to anyone else. *See* Co-Pack Agreement ¶¶ 3, 19-21.

31.     The Agreement prohibits Ascot from selling the same products it makes for ADF to anyone else or using ADF's intellectual property for any purpose other than making products for ADF. *Id.*

32.     In Section 3 of the Agreement, Ascot agreed to manufacture, produce and package the Products (as defined) exclusively for ADF.  Section 3 of the Co-Pack Agreement states, in part:

> Co-Packer shall manufacture, produce, package and store the Products . . . exclusively for Company and shall not produce, sell or otherwise dispose of such Products or use, disclose (directly or indirectly) the Specifications, to manufacture for, or distribute or sell products to, any third parties or for Co-Packer's own benefit.

Co-Pack Agreement ¶ 3.

33.     Importantly, Section 3 prohibited Ascot from using or disclosing (directly or indirectly) ADF's Specifications "to manufacture for, or distribute or sell **products** [lower case] to, any third parties or for Co-Packer's own benefit.  *Id.*; Zab Cross, Tr. 51:15-52:17.  In other words, the prohibition against Ascot's use of ADF's Specifications to sell to third parties, or for its own benefit, applied not only to ADF's specifically defined Products, but also more broadly, to *any product*.

34. Section 3 of the Agreement further states:

> Co-Packer shall be precluded from selling identical products, derived from Company Intellectual Property, including the Specifications and Formulas, as well as other Proprietary Information provided in writing by Company to Co-

Packer (the "Company Intellectual Property"), to others which are specifically made for the Company, irrespective of the brand. [2]

Co-Pack Agreement ¶ 3.

35.    Section 19 of the Agreement states:

Trademarks: Nothing in this Agreement shall give Co-Packer any right, title or interest in Company's trademarks. In addition, Co-Packer shall not adopt any trademark, trade name, trade dress, labeling or packaging which is deceptively similar to or likely to cause confusion with respect to any of Company trademarks or with respect to Products.

*Id.* ¶ 19.

36.    Section 20 of the Agreement states:

Recipes; Formulas: The Parties agree that the specific recipes and/or formulas provided by Company and used by Co-Packer in accordance with the Specifications for the Products (the "Formulas") will remain exclusive to Company and will not be disclosed by the Co-Packer to other customers of the Co-Packer or to any other person or entity. Company hereby grants to Co-Packer a limited, non-exclusive, non-transferable license to use the Formulas for the purpose of allowing Co-Packer to perform its obligations under this Agreement.

*Id.* ¶ 20.

37.    Section 21(a) of the Agreement states:

Each Party (as such, a "Recipient") acknowledges that, for the purposes of carrying out its obligations herein, it has had and will have access to certain Proprietary Information (as defined below) of the other (as such, the "Disclosing Party"), concerning the Disclosing Party's business, plans, products, processes and technical data which is confidential and of substantial value and which would be impaired if such information were disclosed to third parties.

*Id.* ¶ 21(a).

---

[2] Section 3 similarly prohibited Ascot's use of any of ADF's Intellectual Property, including the Specifications, Formulas or other Proprietary Information provided in writing by ADF to derive identical products (lower case, undefined).  Co-Pack Agreement ¶ 3; Zab Cross, Tr. 51:25-52:17.

10

38.    Section 21(b) of the Agreement states, in part:

For purposes of this Agreement, "Proprietary Information" means all information, whether previously, presently, or subsequently disclosed to Recipient, that has commercial or other value to the Disclosing Party and is confidential in nature (including, but not limited to, business and product plans, customer lists, recipes and/or recipe concepts, computer programs, technical drawings, algorithms, trade secrets, patent applications, patentable subject matter, technology, layouts, names and expertise of employees and consultants, know-how, formulas and/or formulations, processes, ideas, inventions (whether patentable or not), technical business, financial, customer and product development plans, forecasts, strategies, and information, and any derivatives of the preceding), whether or not such information is labeled "Confidential" or "Proprietary" or with words of similar meaning.

*Id.* ¶ 21(b).

39.    Section 21(c) of the Agreement states:

Recipient agrees to (i) hold and use the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions Recipient employs with respect to its confidential materials); (ii) not to divulge any such Proprietary Information or any information derived therefrom to any third person; and (iii) not to make any use whatsoever at any time of such Proprietary Information other than to comply with its obligations under this Agreement.

*Id.* ¶ 21(c).

40.    Based on Ascot's refusal to provide assurances that Ascot was not selling meatless meatballs to Lidl, ADF concluded that Ascot was breaching the Agreement and using ADF's intellectual property for other customers. Thakkar Aff. ¶ 29. As a result, ADF refused to pay open invoices until Ascot ceased breaching its obligations under the Agreement. *Id.*

41.    On September 16, 2021, Ms. Rai sent Ascot a follow-up email on the subject:

This is a notice to inform Ascot Valley Foods. We will let our customer Aldi inc., Know what we found at the Lidl stores for them to take action against Lidl in respect

11

of meatballs manufactured through Ascot Valley Foods. Hence we are sending this cautionary notice to Ascot Valley Foods not to entertain Lidl's proposition to manufacture meatballs and other products manufactured for ADF Foods and its customers.

DX-30; Thakkar Aff. ¶ 30.

### VI.    Ascot Valley Responds to ADF's Allegations

42.    In response to Ms. Rai's email that Ascot was in violation of the Agreement and cautioning Ascot not to make meatballs for Lidl, Ascot's counsel sent Ms. Rai a letter dated October 11, 2021 alleging that ADF had breached the Agreement by not ordering a minimum number of cases during the previous year of the term, with an alleged shortfall of 33,555 cases (the "Shortfall Notice").  DX-34; Thakkar Aff. ¶ 31.  The Court credits testimony that, until it received Ms. Rai's email, Ascot had never mentioned the Minimum Commitment to ADF—let alone demanded payment based on any alleged shortfall—during the entire six-year term of the Agreement.  Zab Cross, Tr. 33:17-20; 67:24-68:1.

43.    Mr. Zab also confirmed at trial that ADF was not in default on any invoices at the time Ms. Rai emailed Ascot about its unlawful use of ADF's recipes and intellectual property to sell to Lidl.  Zab Cross, Tr. 67:12-23.

44.    The Shortfall Notice stated "[t]his letter shall serve as notice on behalf of Ascot to ADF that ADF's purchase orders during the Term year July 29, 2020 – July 28, 2021 failed to specify quantities of Product at least equal to the Minimum Commitment for such year, as required under Section 2 of the Agreement."  DX-34; Thakkar Aff. ¶ 32.

45.    The Shortfall Notice enclosed an invoice for the alleged shortfall, which invoice stated: "Due Date 11/10/21." DX-34.

12

46.     Twenty days before the due date of the invoice, Ascot sent ADF a letter dated October 22, 2021 purporting to terminate the Agreement effective January 20, 2022 for failure to pay the invoice attached to the defective Shortfall Notice.  PX-10.

47.     ADF's representatives testified that Ascot's Shortfall Notice was surprising to them for several reasons.  Thakkar Aff. ¶ 40; Rai Dep. 94:24-95:13.  First, since entering into the Agreement in 2015, ADF did not purchase 200,000 cases of product from Ascot in all but one year, depending on the measurement period.  Thakkar Aff. ¶ 40.  The Court credits testimony that it was ADF's understanding that, from the parties' course of dealing, Ascot could not make all the products that it had promised to make for ADF, and that the volume produced would therefore be lower than 200,000 cases per year.  Thakkar Aff. ¶ 40; Rai Dep. 80:4-14; 99:12-100:18.  The Court further credits testimony that ADF met regularly with Ascot to find out its capacity, and that its orders were determined based on Ascot's capacity.  Thakkar Aff. ¶ 40; Rai Dep. 46:1-47:11, 49:9-23, 53:6-23, 99:12-101:17.

48.     Crucially, Section 2 of the Agreement requires that, in the event of a shortfall, ADF shall have the option to "purchase or pay for the balance of Company's Minimum Commitment." Co-Pack Agreement ¶ 2.  ADF placed four orders that, collectively, were for more than 56,000 cases, and which would have met the alleged shortfall, but Ascot refused to produce these orders due to the outstanding unpaid invoices.  DX-20 (order for 5,500 cases dated July 19, 2021); DX-23 (order for more than 11,000 cases dated August 16, 2021); DX-29 (order for more than 20,000 cases dated September 14, 2021); DX-35 (order for more than 18,000 cases dated October 18, 2021); Thakkar Aff. ¶ 42.  At trial, Mr. Zab did not deny that ADF had submitted purchase orders for 56,600 cases of product:

> Q:     My question to you, Mr. Zab:  They had issued you purchase orders.  I'm not asking about what they said.  They had issued you purchase orders for 56,600 cases.

A:      They may have.  We sent them back.  I have no idea.

Zab Cross, Tr. 94:6-9.

49.     The Court finds that Ascot, by failing to fulfill these orders, failed to offer ADF the opportunity to purchase product in the Shortfall Notice, as provided for in Section 2 of the Agreement.  Co-Pack Agreement ¶ 2 ("[N]otice will create a binding obligation on Company **to purchase** or pay for the balance of Company's Minimum Commitment."); Zab Cross, Tr. 40:16-18 (Ascot did not offer ADF the opportunity to purchase the purported shortfall amount).

**VII.    Liability for Purchased Materials**

50.     In Count IV of the Complaint, Ascot alleges that it reasonably relied on ADF's promises when it ordered and paid for custom materials and packaging.  PX-1 ¶¶ 94-102.  However, the only promise ADF made to Ascot was in the Agreement.  Thakkar Aff. ¶ 45.

51.     Section 6 of the Agreement provides that ADF is required to reimburse Ascot for raw materials only if *ADF* terminates the Agreement prior to the expiration of the Initial Term or any Renewal Term.  Co-Pack Agreement ¶ 6.  However, it is undisputed that *Ascot* terminated the Agreement.  PX-1 ¶ 110.

52.     The issue of reimbursement for raw materials arose previously in 2018.  When Ascot ceased making burritos in 2018, Ascot demanded payment of $114,000 for raw materials and packaging for the production of burritos.  ADF advised Ascot in writing that:

> As per Clause 6 of the original agreement dated July 29, 2015, if ADF terminates the agreement  prior to expiration of the initial term  or renewal term (<u>other than for cause</u>) then ADF shall reimburse co-packer for materials already purchased by co-packer for products ordered by ADF prior to effective date of such termination.  The said clause is not applicable in this case as the discontinuation of burrito is  solely on  account  of AVF's failure to  fulfill purchase orders as per the due dates on many instances.

DX-8 at 1-2; Thakkar Aff. ¶ 44; Rai Dep. 62:8-63:1; *see also* Zab Cross, Tr. 25:6- 26:2; 26:22-

27:12 (confirming that Section 6 of the Agreement only obligates ADF to pay for raw materials if ADF terminates the Agreement, and acknowledging that based upon this provision, ADF refused to pay for burrito raw materials in 2018).

53.    The Court credits testimony that ADF never promised, in the Agreement or otherwise, to pay for raw materials or packaging if Ascot terminated the Agreement.   Mr. Zab confirmed as much at trial:

> Q:        The contract between the parties, the Co-Pack Agreement from 2015, says that all agreements, understandings, are contained in the agreement between the parties; correct?
>
> A:        Correct.
>
> Q:        And there are no other agreements between the parties.
>
> A:        Correct.
>
> Q:        No other promises have been made –
>
> A:        Correct.
>
> Q:        -- by either party.

Zab Cross, Tr. 27:16-23.

54.    In addition, as noted above, ADF attempted to purchase products from Ascot, including the open purchase orders, but Ascot refused to make them.  Rai Dep. 111:25-112:13; 128:4-9; 131:17-132:5; Zab Cross, Tr. 33:5-13.[3]

---

[3] In addition, the second-to-last sentence of Section 6 of the Agreement requires Ascot to return all unused packaging materials: "Upon the expiration or earlier termination of this Agreement, Co-Packer … shall return all unused Packaging Materials to Company…."  Co-Pack Agreement ¶ 6. Ascot admits that it did not comply with this provision.  Zab Dep. 111:9-16 ("Q. So would it be fair to say that Ascot Valley has not complied with the second-to-last sentence of Section 6 of the co-pack Agreement? … A We have not sent them anything. Q So that would a "yes", correct? A Correct. A substantial portion of Ascot's promissory estoppel claim is for packaging."); *see also* Zab Tr. Cross, 31:15-32:19.

15

**VIII.    Allegations of Malicious Business Practices by Ascot Valley**

55.    The Court heard testimony that Ascot had long been attempting to steal ADF's business.  As Mr. Zab did not dispute, Ascot was seeking to supplant ADF's role and deal directly with retailers in selling meatless meatballs.  Zab Cross, Tr. 57:21-58:24 (confirming that Ascot was exploring becoming a broker that dealt directly with retailers in selling meatless meatballs).  On September 16, 2021, immediately after ADF notified Ascot of its breaches, Ascot's Board Chairman, Ron Dees, wrote to Mr. Zab, Ascot's President, saying that Ascot should take immediate retaliatory action against ADF.  DX-52; Zab Cross, Tr. 68:25-70:5 (also confirming that after ADF's notice regarding potential exclusivity breach, Ascot never produced another product for ADF.)

56.    Mr. Dees' email continued:

I believe you need to send a brief note to advise all members that the long-anticipated confrontation with ADF on multiple fronts has begun and this might result in our termination of the contract and/or litigation.

DX-52; Zab Cross, Tr. 70:6-9.

57.    Based on Mr. Zab's testimony and its findings described below regarding Ascot's misappropriation of ADF's trade secrets, the Court finds that Ascot Valley manufactured a reason to get out the Co-Pack Agreement in an attempt to steal ADF's business.  The Court declines to credit Mr. Zab's testimony that Ascot Valley did not knowingly utilize ADF's trade secrets to sell meatless meatballs to Lidl and finds that Ascot was already anticipating litigation when Ms. Rai's email came in.  Zab Cross, Tr. 71:18-72:5.

**IX.    Expert Testimony Regarding Recipe Comparisons**

58.    As noted above, several provisions of the Agreement prohibit Ascot from selling the same products it makes for ADF to anyone else or using ADF's intellectual property for any purpose other than making products for ADF.

59.    ADF called Mahabir Singh to testify as an expert in food science and technology. Mr. Singh has a master's degree in food technology and is pursuing a Ph.D. in food science and technology. *See* March 16, 2026 Declaration of Mahabir Singh ("Singh Dec.") ¶ 2, ECF No. 148; *see also* Cross-Examination of Mahabir Singh ("Singh Cross"), ECF No. 152, at Ex. C, Tr. 7:16-8:1.  He has more than two decades of directly relevant experience, having worked for over 25 years in the development and production of food products, while currently running a consultancy for new product development and plant design in India and abroad. Singh Dec. ¶ 2.  Mr. Singh has performed experiments more than over 100 recipes to compare and analyze food products as part of product development.   Singh Dec. ¶ 4.  This process involves a comparison of ingredients, ingredient percentages and means of production to determine the similarity of a product under development to other products on the market. *Id*.

60.    Mr. Singh used his experience and training in product development to determine the procedures he used to evaluate and compare the meatless meatballs in this case. *Id*. ¶ 5.  Those procedures are widely used by food scientists in the industry in developing new products. *Id*. ¶ 5.

61.    For each product, Mr. Singh compared the ingredients used in the recipe and the cooking means and methods employed in the manufacturing of the items. *Id.* ¶ 5; March 16, 2026 Declaration of David Potter ("Potter Decl.") ¶ 9, ECF No. 147, 147-1.  His report details his analysis and methodology. *Id.* ¶ 5.  At trial he explained how the methodology he employed led to his conclusions and could be re-tested.  For example, Mr. Singh explained that for his comparison of Product #1, Nate's Classic Meatballs ("NCM") manufactured for ADF vs. Lidl Classic Meatballs ("LCM") manufactured for Lidl, the same ingredients comprised 99.9% of the entire NCM recipe and 98.9% of the entire LCM recipe, Singh Cross, Tr. 26:6-16, and that for each of the seven products he compared in his report, he viewed the entire recipe for each product and identified and compared the percentage of ingredients that were the same in each product. *Id.*

17

30:6-10. Mr. Singh also explained during trial that his comparison of the preparation methods for each of the corresponding seven recipes he reviewed demonstrated that "in all the products, the processing time are [the] same, not even a single degree or single minutes' difference." *Id.* 30:11-23.

62. Based upon these repeated observations and using the same methodology across each of the seven products he analyzed, Mr. Singh concluded "that the original recipes were ADF's recipes, Ascot Valley tweaked a little bit the seasoning part or some of the ingredients and they tried to name it as a new recipe" and that "[Ascot Valley] took the ADF recipes, tweaked them to some extent, and followed the same process, same time to process, and processing conditions to produce nearly identical or similar products." *Id.*

63. Based on the above, the Court finds that Mr. Singh was qualified to testify as an expert in food science and technology and concludes that his opinion testimony and report were admissible. The Court credits Mr. Singh's testimony in full and adopts his findings that Ascot Valley made slight "tweak[s]" to the recipes obtained from ADF to attempt to pass off the recipes as new.[4]

64. To summarize, the evidence that Ascot breached Sections 3, 19, 20 and 21 of the Agreement includes:

- Prior to entering the agreement, AVF had never made any of the products listed on Exhibit A of the Agreement (including meatless meatballs) and did not have recipes for them. Kropp Dep. 21:9-18; 31:22-25.

- ADF sent AVF its recipes, cooking instructions, and packaging and materials suppliers for the products. *Id.* 21:19-22:3; 29:25-31:11; 31:22-25; 33:5-34:7; 49:24-51:16; 51:23-52:6; 54:7-55:7; DX-1; DX-2 and DX-3.

---

[4] For the reasons stated above, Ascot's Motion to Exclude Mr. Singh's testimony is DENIED. *See* ECF No. 151. The Court concludes that Mr. Singh is qualified to testify and that his expert testimony is proper. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

- ADF sent production personnel from its San Francisco plant to help AVF learn how to make recipes.  Thakkar Aff. ¶ 10; Kropp Dep. 37:16-38:7.

- Prior to its agreement with ADF, AVF had never manufactured meatless meatballs for any customer other than ADF.  Kropp Dep. 37:6-12.

- When Ascot purchased AVF's assets, AVF transferred all of its recipes, cooking instructions, records and equipment to Ascot.  Kropp Dep. 42:23-43:2; 49:24-50:16.

- Ascot's research and development team had a basic meatless meatball formulation that was used to make meatless meatballs for customers other than ADF.  Foster Dep. 44:10-25.

- The meatless meatballs Ascot made were essentially the same for all customers.  Foster Dep. 48:18-49:8.

- In making meatless meatballs for new customers other than ADF, the research and development manager would refer to recipes used for existing customers. Foster Dep. 66:9-21.

- Ascot would send samples of products it made for existing customers to new customers and then make slight alterations to existing meatball recipes so that the recipes were not exactly the same.  Foster Dep. 76:6-22; 77:16-24.

- Ascot used formulations and processing methods that were derived from the ADF Foods recipes to produce nearly identical products for other customers, including Lidl, Creative Fine Foods and Topco. DX-45 ¶ 13; Singh Dep. 31:25-32:19. The differences were mere tweaks.  Singh Dep. 31:25-32:6.

- Ascot's recipe for Lidl was almost identical to the ADF recipe for Aldi and Nates. The ingredients in Lidl's Classic Meatless Meatballs are a 98.9% match with Nate's Classic Meatless Meatballs' ingredients.  Singh Dep. 21:23-22:7; DX-45 ¶ 9 (Product 1).

- The ingredients in Creative Fine Foods's Classic Meatless Meatballs (sold to Aldi) are a 91.5% match with Trader Joe's Classic Meatless Meatballs' ingredients (sold by ADF to Trader Joe's).  Singh Dep. 25:16-29:13; DX-45 ¶ 9 (Product 2).

- The ingredients in Creative Fine Foods's Classic Meatless Meatballs (sold to Aldi) are a 93.05% match with Nate's Classic Meatless Meatballs' ingredients.  Singh Dep. 29:14-31:24; DX-45 ¶ 9 (Product 3).

19

- The ingredients in Lidl's Zesty Meatless Meatballs are a 91.60% match with ADF's Classic Meatless Meatballs' ingredients sold to Aldi.  Singh Dep. 38:1-41:3; DX-45 ¶ 9 (Product 4).

- The ingredients in Creative Fine Foods's Zesty Meatless Meatballs (sold to Aldi) are a 91.09% match with Nate's Zesty Meatballs' ingredients.  Singh Dep. 42:2-43:17; DX-45 ¶ 9 (Product 6).[5]

- The ingredients in Topco's Classic Meatless Meatballs (sold by Ascot to Topco) are a 88.87% match with Nate's Classic Meatballs' ingredients.  Singh Dep. 43:18-44:20; DX-45 ¶ 9 (Product 7).

- The processes used to manufacture the products are identical, using the same temperature and time to fry the products. Singh Dep. 48:12-49:21.

65.    The Court declines to credit the testimony of Ascot's expert, Marc Meyers.  Mr. Meyers used the same methodology that Mr. Singh used to compare the recipes for ADF products against the recipes Ascot used to make meatless meatballs for Lidl, Creative Fine Foods and Topco.  Cross Examination of Marc Meyers ("Meyers Cross"), Tr. 106:17-20.

66.    Mr. Meyers did not do any analysis himself.  Mr. Meyers testified that all of the tables in his report were provided to him by Ascot's counsel and he assumed that someone at Ascot performed the analysis correctly:

> Q.  Okay.  And so my question for you is, you have a series of tables that are inserted into your report that do comparisons of the ingredients used in the products.
>
> A.  Yes.
>
> Q.  Okay.  So, there's one on 18, 20, 22, just as way of example.
>
> A.  You're talking pages 18 –
>
> Q.  Yeah.  You see, basically, it looks like it was embedded from an Excel spreadsheet?

---

[5] Product 5 was a comparison of a Nate's recipe to Lidl's recipe; this comparison was addressed in Product 1 with a different version of the Nate's recipe.

A.   Yeah.   Uh-huh.

Q.   Okay.   That's what I'm referring to when I say "tables."

A.   Yes.

Q.   Okay.   Now, these compare the ingredients on a percentage basis.

You have to answer.

A.   Yes.   Sorry.

Q.   Now, you didn't actually do these comparisons; correct?

A.   The data was provided to me in an Excel sheet.   I reviewed them.

Q.   Okay.   And that was given to you by plaintiff Ascot's counsel.

A.   Counsel.   Correct, yes.

Q.   And you assumed somebody at Ascot prepared these comparisons for you; correct?

A.   Yes.

Q.   You don't know who prepared them, though.   Like, the name of the individual.

A.   No.

Q.   And you didn't make any changes to the spreadsheets that you embedded into your report.

A.   No.

Q.   You also assumed that whoever prepared these spreadsheets used the right recipes.

A.   Yes.

Meyers Cross, Tr. 102:17-103:25.

67.    Mr. Meyers also acknowledged that Ascot made mistakes in calculating the percentage differences that it alleges show the products are different.  For example, Ascot double-counted breader ingredients when doing the comparison, which made the differences seem greater. Meyers Cross, Tr. 111:11-24.  Mr. Meyers stated he would not have double-counted the breaders if he had done the analysis contained in his report himself.  *Id.*

68.    Finally, Mr. Meyers's testimony made it clear that Ascot selectively provided him information to skew his opinions.  With respect to breader, Ascot provided Mr. Meyers with a required food-safety document maintained by manufacturers, a Certificate of Analysis, so that he could determine that the two breaders made by Newlyweds had slightly different ingredients. Meyers Cross, Tr. 117:10-118:16.  But, with respect to the spice mixes that Ascot used to manufacture the meatless meatballs, Ascot failed to provide him with a similar Certificate of Analysis.  As a result, Mr. Meyers assumed that the ingredients in the spice mixes were completely different than the spices used in the other recipes.  Meyers Cross, Tr. 116:20-117:9; PX-17 at 21.

69.    In light of the above, the Court declines to credit Mr. Meyers's testimony.  On balance, the evidence supports the conclusion that Ascot violated ADF's trade secrets by using its recipes to create meatless meatballs for other customers.  Singh Dep. 53:17-54:2. The Court finds as such.

## X.    Testimony Regarding Efforts to Obtain ADF's Customers

70.    The Court also credits testimony that Ascot intended to mimic ADF's recipe to secure business from one of Aldi's biggest competitors, Lidl.  DX-5.  Ascot's sales manager, Nick Crutchman, told Lidl in an email that they had started production for Zesty and Classic Meatballs for a large retailer in the country under a private label.  *Id.*  Prior to that time, the only large retailer for whom Ascot had been making meatless meatballs was ADF.  Crutchman Dep. 146:14-23.

71.    Ascot sent samples of a Classic Meatless Meatball and a Zesty Meatless Meatball to Lidl.  Lidl responded "I reviewed the samples and they are an exact match to Aldi so quality is approved." DX-9.

72.    Not only did Lidl want Ascot to duplicate the Aldi meatball, but it requested to use the same packaging as Aldi: "This is for another NEW customer – Lidl – grocery store chain who wants their bags to look similar to aldi.  The meatless meatballs will be going into the current aldi bags – dims – surface print." DX-16.

73.    Ascot also sold infringing meatless meatballs through a broker named Cara Gardner.  Ascot's first involvement with Ms. Gardner was when she visited Ascot in 2017 representing a private equity firm to learn about Ascot.  She was given access to customer data, volumes, profitability, and all of Ascot's books and records.  Zab Dep. 50:8-51:2.

74.    Ms. Gardner began working with Ascot through her company, Creative Fine Foods, to sell meatless meatballs to Topco in 2020.  Gardner Dep. 30:9-34:8; DX-17; DX-44.  Although she was an independent contractor with her own company, Ms. Gardner represented herself as a Vice President of Ascot to customers.  Gardner Dep. 24:25-25:11; 26:9-12; 27:13-23; DX-19.

75.    In December 2021, Ascot began selling meatballs to Aldi as well.  Mr. Zab called Ms. Gardner and asked her whether she was interested in selling meatless meatballs to Aldi.  Gardner Dep. 44:12-17.  Ms. Gardner knew that Ascot was already manufacturing meatless meatballs for ultimate sale to Aldi.  Gardner Dep. 44:20-45:7.  Ms. Gardner then contacted a buyer at Aldi and pitched the sale of meatless meatballs.  Gardner Dep. 46:12-47:8; 48:15-18; 50:24-51:3; 51:15-52:10.  Ascot then sent meatless meatball samples to the buyer.  Gardner Dep. 52:11-20.  The buyer said the samples tasted very similar to the meatless meatballs it had purchased in the past and wanted to move forward with them.  Gardner Dep. 53:14-25.  To make sure that ADF

could not compete, Gardner requested that the cost to Aldi be lower than when Ascot produced the meatballs for ADF to sell Aldi.  Gardner Dep. 59:20-60:13; DX-12 at 3.

76.    In May of 2022, Ascot and Gardner also began selling Classic and Zesty Meatless Meatballs to Aldi.  DX-42.

77.    The Court finds that Ascot's ability to make meatless meatballs that taste very similar to the meatless meatballs ADF sold to Aldi was possible only because Ascot used ADF's recipes with minor tweaks.  Singh Dep. 21:23-22:7; 29:14-31:24; 38:1-41:3; 42:2-44:20; DX-45 ¶ 9 (Products 1-4, 6).

78.    Meatless meatballs are not a generic product where all producers use the same recipes.  DX-45 ¶¶ 10-11.  Many products have completely different product ingredients and recipes from what ADF shared with Ascot.  *Id.*  The Court specifically credits testimony that, if a producer sought to make meatless meatballs from scratch, there are many different recipes and methodologies that would produce an end product.  Singh. Dec. ¶¶ 10-11.  The Court credits Mr. Singh's testimony finds that Ascot must have based their recipe on ADF's meatless meatball recipes in order to have such similar products.  *Id.*

**XI.    Ascot's Profits from Meatless Meatball Sales**

79.    In 2022, Aldi sold $1,904,256 of Classic and Zesty Meatless Meatballs to Creative Fine Foods for sale to Aldi.  DX-44.  From January 2023 to August 2023, Ascot sold $1,603,584 of Classic and Zesty Meatless Meatballs to Aldi.  *Id.*

80.    For the overall time period from January 1, 2020 to December 31, 2025, Ascot sold $8,303,924 of meatless meatballs to Aldi, on which its gross margin was $1,952,857.  DX-50; Zab Cross, Tr. 84:10- 85:12.  In total, Ascot's revenues from sales of meatless meatballs to all customers other than ADF equaled $8,981,453, on which its gross margins were $2,298,114.  DX-50.

24

81.     Ascot has continued to profit from the sale of meatless meatballs to customers other than ADF. Zab Cross, Tr. 85:13-14 (confirming that Ascot has continued to sell meatless meatballs to ALDI in 2026).

82.     The Court finds that ADF has shown that Ascot's total profit from the sale of meatless meatballs produced using ADF's trade secrets was $2,298,114.

**CONCLUSIONS OF LAW**

Based upon the above findings of fact, the Court makes the following conclusions of law:

**I.     The Parties' Breach of Contract Claims Arising from Purchase Orders**

To successfully bring a breach of contract claim, a plaintiff must plead: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract, (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by the defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).[6]

**A. Ascot Valley's Claims for Unpaid and Unplaced Orders**

On its breach of contract claim, Ascot Valley seeks damages in the amounts of: (1) $100,706.96 (for ADF's failure to pay for goods sold, delivered, and invoiced to ADF), and (2) $821,761.95 (for failure to order a minimum quantity of 200,000 cases), plus pre-judgment and post-judgment interest. *See* Compl. ¶ 88, ECF No. 1. The Court concludes that Ascot Valley is entitled to judgment for the goods ordered and delivered, but is not entitled to any damages related to the minimum order quantity.

---

[6] In all quotations from cases, citations, footnotes, brackets, ellipses, and emphases are omitted unless otherwise indicated.

First, with respect to the purchase orders that were indisputably fulfilled, the Court concludes that Ascot Valley is entitled to damages and interest on the unpaid invoices. With respect to these purchases, Ascot Valley performed their contractual obligations, and ADF refused to pay for the goods they received. Whether a breach of the Co-Pack Agreement or through a claim for account stated,[7] ADF is liable to Ascot Valley for payment for the invoices for product ordered and delivered. Specifically, Invoice 2424 (dated 8/23/21 with 10/7/21 due date for $744.46), Invoice 2428 (dated 8/26/21 with 10/10/21 due date for $23,627.50), Invoice 2433 (dated 8/30/21 with 10/14/21 due date for $29,080.00), Invoice 2451 (dated 9/14/21 with 10/29/21 due date for $21,810.00), and Invoice 2468 (dated 9/28/21 with 11/12/21 due date for $25,445.00) were each ordered by ADF, manufactured and delivered by Ascot, and accepted by ADF. ADF has retained each of those invoices without objecting to them in a reasonable time. Zab Aff. ¶¶ 30-33, 38-39; Rai Dep. 127:1-18; Thakkar Tr. 133:12-16. ADF has provided no authority for the proposition that it is somehow excused from paying for this product because of Ascot Valley's unrelated breaches of the Agreement. Accordingly, Ascot Valley is entitled to partial judgment on Count I awarding it $100,706.96, plus interest.

Second, with respect to the minimum order requirement, the Court concludes that Ascot Valley has not established liability or damages for this claim. Section 2 of the Agreement provides, in pertinent part,

---

[7] To establish a claim for account stated under New York law, a plaintiff must show: "(1) an account was presented, (2) the account was accepted as correct, and (3) the debtor promised to pay the amount stated." *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 198 (S.D.N.Y. 2009) . The second and third elements "may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes a partial payment.'" *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (quoting *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999)).

> if the company's purchase orders, in the aggregate as of the end of
> any year during the Term or Renewal Term, as applicable, fail to
> specify quantities of Product at least equal to the Minimum
> Commitment for such year as provided in this Section 2, Co-Packer,
> in its sole discretion, may send Company written notice (including
> an invoice) of its purchase shortfall, which notice will create a
> binding obligation on the Company to purchase or pay for the
> balance of Company's Minimum Commitment.

Co-Pack Agreement ¶ 2. The contract unambiguously required Ascot Valley to give ADF the option to purchase the shortfall. But ADF was not given such an opportunity. Ascot's Shortfall Notice, which identified an alleged shortfall of just over 33,000 cases, was dated October 11, 2021. DX-34. As of that date, ADF had put in three orders collectively totaling more than the amount of the alleged shortfall, which Ascot Valley refused to fulfill. *See* DX-20 (order for 5,500 cases dated July 19, 2021); DX-23 (order for more than 11,000 cases dated August 16, 2021); DX-29 (order for more than 20,000 cases dated September 14, 2021). And ADF subsequently put in an additional order, which Ascot Valley also refused to fulfill. *See* DX-35 (order for more than 18,000 cases dated October 18, 2021).[8]

Ascot Valley's counterarguments are unavailing. It argues that these orders should not be counted towards the minimum orders requirement because they were placed too late. But the Co-Pack Agreement clearly contemplates that orders to cure a shortfall may be placed after the relevant 12-month period for calculating compliance with the minimum purchase orders requirement. As noted above, Section 2 provides for notice in the event of a shortfall, "which notice will create a binding obligation on the Company to purchase or pay for the balance of

---

[8] The parties spend a great deal of time arguing over the precise period for calculating the minimum order requirement, but there is no dispute that, even assuming that Ascot Valley is correct about the right timeframe and that the order shortfall totaled approximately 33,000 cases, ADF submitted orders sufficient to cover that deficiency. Ascot Valley simply refused to fill them.

Company's Minimum Commitment." Co-Pack Agreement ¶ 2. Here, after the alleged shortfall occurred, Ascot Valley shall give notice of it, which triggered an option for ADF to pay for or purchase the alleged shortfall—all of which could only occur after the fact. And, as noted, ADF placed orders sufficient in the number to cover the alleged shortfall. Ascot Valley cannot claim damages for a failure to make a sufficient number of orders, because ADF in fact placed orders exceeding the amount of the alleged shortfall.

Ascot Valley argues that it was not obliged to fill these orders in light of ADF's failure to for prior orders that it did fulfill. As explained below, the Court ultimately agrees with that argument. But Ascot Valley's reasonable decision not to fulfill certain orders does not mean that ADF failed to place them for purposes of satisfying the minimum purchase orders requirement. Accordingly, Ascot Valley is not entitled to any damages relating to the minimum order commitment.

**B. ADF's Claims for Unfulfilled Orders**

ADF argues that it is entitled to damages stemming from Ascot Valley's failure to produce the four unfulfilled orders described above. However, the Court concludes that, due to ADF's breach of the agreement in failing to pay invoices for goods purchased, delivered, and accepted, it cannot obtain damages stemming from Ascot Valley's refusal to accept purchase orders after this breach. "A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997). The Court concludes that non-payment of invoices is a material breach such that Ascot Valley was excused from fulfilling ADF's subsequent purchase orders.

28

## II.     Ascot Valley's Claims with Respect to Raw Materials

Ascot Valley also seeks damages for raw materials purchased to manufacture products ordered by ADF.   However, the Court concludes that the Ascot Valley has failed to prove entitlement to damages for these purchases.

To begin, the Court concludes that there is no contractual basis for damages.  The contract unequivocally states that ADF is required to pay for raw materials purchased only if *ADF* cancels the Agreement.  Paragraph 6 of the Agreement states, in relevant part:

> **Raw Materials, Ingredients; Packaging Materials**. Co-Packer shall be responsible for timely procurement of and payment for all raw materials and ingredients used in the manufacture and production of the Products ("Raw Materials" and "Ingredients", respectively) and all packaging materials used for the Products (the "Packaging Materials" and collectively with Raw Materials and Ingredients, the "Materials"). . . . Co-Packer shall bear sole responsibility for all risk of loss or damage to such Materials while the same are in its care, custody or control. . . . **If Company terminates this Agreement prior to the expiration** of the Initial Term or Renewal Term for any reason (other than "for cause"), **Company shall reimburse Co-Packer for Materials already purchased by Co-Packer** for Products ordered by Company prior to the effective date of such termination.

Co-Pack Agreement ¶ 6 (emphasis added).  As the Court previously explained, this provision "addresses claims for such expenses only in the context of *early termination* of the agreement; it does not address the situation here, where Ascot Valley incurred expenses to ensure it could fulfill orders consistent with ADF's minimum purchase requirement, only for ADF to allegedly fail to meet that obligation." *Ascot Valley Foods, Ltd. v. ADF Foods (USA), Ltd.*, No. 22 Civ. 2655, 2026 WL 322834, at *6 (S.D.N.Y. Feb. 6, 2026).  Accordingly, there is no contractual basis for damages stemming from raw materials and packaging expenses.

The Court also concludes that Ascot has failed to show entitlement to damages on a theory of promissory estoppel.  Under New York law, promissory estoppel requires "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

29

Promissory estoppel generally applies "only where there is no written contract, or where the parties' written contract is unenforceable for some reason." *Washington v. Kellwood Co.*, No. 05 Civ. 10034, 2009 WL 855652, at *9 (S.D.N.Y. Mar. 24, 2009). But the mere "existence of a written contract does not automatically foreclose all promissory estoppel claims." *Id.* at *9; *see also Curtis Props. Corp. v. Greif Cos.*, 653 N.Y.S.2d 569, 571 (N.Y. App. Div. 1997) ("[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories . . . where the contract does not cover the dispute in issue").

Ascot Valley's case fails at the first step, as it has provided no evidence of a promise from ADF to pay for the raw materials in the event of a termination of the Agreement. Ascot points to the contract itself, arguing that the minimum purchase commitment constitutes a clear and unambiguous promise. PX-1 ¶ 99 ("*Pursuant to the Co-Pack Agreement*, the promise to pay for 200,000 cases of good unique and exclusive to ADF is clear and unambiguous." (emphasis added)). As explained above, a written contractual provision cannot yield a promissory estoppel claim under New York law. *Kellwood Co.*, 2009 WL 855652, at *9. Ascot Valley also argues that it reasonably relied on the parties' past dealings in acquiring the raw materials in question, but it cites no authority for the proposition that such past conduct amounts to a clear and unambiguous promise of future dealings for purposes of a promissory estoppel claim.

In sum, because Ascot Valley failed to introduce any evidence of an extrinsic promise to reimburse Ascot in the event of Ascot's termination of the Agreement, the Court concludes that Ascot Valley is not entitled to damages for the unused raw materials.

## III.    ADF's Trade Secrets Claims

The Court concludes that ADF is entitled to judgment on its trade secrets claims. Courts in this District recognize that "[t]he elements for a trade misappropriation claim under [the DTSA and] New York law are fundamentally the same" and therefore "District courts often rely on cases

30

discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. 3d 367, 380 (S.D.N.Y. 2020).

"To plead misappropriation of a trade secret under the DTSA, 18 U.S.C. § 1832, *et seq.*, a plaintiff must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *24 Seven, LLC v. Martinez*, No. 19 Civ. 7320, 2021 WL 276654, at *4 (S.D.N.Y. Jan. 26, 2021). "Similarly, under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Id.* Under both New York law and the DTSA, where an agreement protects against disclosure of confidential information that is a trade secret, a breach of that contractual obligation gives rise to liability for misappropriation. *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 806 (2d Cir. 2023) (explaining that a company violated a confidentiality provision in an agreement by using trade secrets obtained pursuant to the agreement to launch a competing product).

A "trade secret" includes "all forms and types" of information that "derives independent economic value ... from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information," and that the owner of which took "reasonable measures" to keep secret. 18 U.S.C. § 1839(3). New York courts generally adopt the six-factor test articulated in the First Restatement of Torts to determine whether information constitutes a trade secret under either the DTSA or state law, assessing "(1) the extent to which the information is known outside of the business; (2) the

extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Ashland Management Inc. v. Janien*, 82 N.Y. 2d 395, 407 (1993) (quoting Restatement of Torts § 757 cmt. B).

As explained above, the Court finds that Ascot Valley misappropriated ADF's recipes in violation of the DTSA and New York law. Per the Co-Pack Agreement, Ascot was provided with ADF's recipes, formulas, and other intellectual property and proprietary information, which Ascot was required to keep confidential, could not disclose to any other customer or third party, and could not use for any purpose other than to service the Agreement (i.e., to make products for ADF). Several provisions of the agreement provided as such, including:

- Section 3, in which Ascot agreed to manufacture, produce and package the Products exclusively for ADF:

  > Co-Packer shall manufacture, produce, package and store the Products… exclusively for Company and shall not produce, sell or otherwise dispose of such Products or use, disclose (directly or indirectly) the Specifications, to manufacture for, or distribute or sell products to, any third parties or for Co-Packer's own benefit. Co-Packer is prohibited from selling or donating the Products, non-conforming or otherwise, without the explicit written consent of Company.
  >
  > …
  >
  > Co-Packer shall be precluded from selling identical products, derived from Company Intellectual Property, including the Specifications and Formulas, as well as other Proprietary Information provided in writing by Company to Co-Packer (the "Company Intellectual Property"), to others which are specifically made for the Company, irrespective of the brand.

- Section 19 of the Agreement prohibited Ascot's unauthorized use of any of ADFs trademarks, trade dress, labeling or packaging:

32

Nothing in this Agreement shall give Co-Packer any right, title or interest in Company's trademarks. In addition, Co-Packer shall not adopt any trademark, trade name, trade dress, labeling or packaging which is deceptively similar to or likely to cause confusion with respect to any of Company trademarks or with respect to Products.

- Section 20 protected ADF's recipes and formulas from disclosure or use except to perform Ascot's obligations under the Agreement:

  The Parties agree that the specific recipes and/or formulas provided by Company and used by Co-Packer in accordance with the Specifications for the Products (the "Formulas") will remain exclusive to Company and will not be disclosed by the Co-Packer to other customers of the Co-Packer or to any other person or entity. Company hereby grants to Co-Packer a limited, non-exclusive, non-transferable license to use the Formulas for the purpose of allowing Co-Packer to perform its obligations under this Agreement.

- Section 21 and its sub-parts provided broad protection against disclosure of ADF's Proprietary Information:

  21(a):  Each Party (as such, a "Recipient") acknowledges that, for the purposes of carrying out its obligations herein, it has had and will have access to certain Proprietary Information (as defined below) of the other (as such, the "Disclosing Party"), concerning the Disclosing Party's business, plans, products, processes and technical data which is confidential and of substantial value and which would be impaired if such information were disclosed to third parties.

  21(b):  For purposes of this Agreement, "Proprietary Information" means all information, whether previously, presently, or subsequently disclosed to Recipient, that has commercial or other value to the Disclosing Party and is confidential in nature (including, but not limited to, business and product plans, customer lists, recipes and/or recipe concepts, computer programs, technical drawings, algorithms, trade secrets, patent applications, patentable subject matter, technology, layouts, names and expertise of employees and consultants, know-how, formulas and/or formulations, processes, ideas, inventions (whether patentable or not), technical business, financial, customer and product development plans, forecasts, strategies, and information, and any derivatives of the preceding), whether or not such information is labeled "Confidential" or "Proprietary" or with words of similar meaning.

33

> 21(c): Recipient agrees to (i) hold and use the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions Recipient employs with respect to its confidential materials); (ii) not to divulge any such Proprietary Information or any information derived therefrom to any third person; and (iii) not to make any use whatsoever at any time of such Proprietary Information other than to comply with its obligations under this Agreement.

PX-1; Thakkar Aff. ¶¶ 21-28.

At closing argument, counsel for Ascot Valley asserted that a recipe for meatless meatballs is common knowledge that one could find with a simple internet search. But there is no persuasive evidence in the record to that effect. Rather, as noted above, the balance of the evidence in the record compels the Court to conclude that ADF's recipes and cooking specifications were trade secrets, as these recipes were valuable assets that ADF invested significant time, money and resources into developing, from which it derived substantial economic benefit, and which it was vigilant in safeguarding. Thakkar Aff. ¶ 21. The Court also relies on Mr. Singh's testimony to conclude that ADF's recipes were not easily replicable and differed from publicly available formulations for meatless meatballs. Singh. Decl. ¶¶ 10-11; cf. In re Parmalat Sec. Litig., 258 F.R.D. 236, 255 (S.D.N.Y. 2009) (explaining that recipes are not entitled to trade secrets protection if they are publicly available).

And based on the evidence adduced at trial, the Court finds that Ascot Valley misappropriated these trade secrets in producing meatless meatballs for its own benefit. Accordingly, the Court concludes that Ascot is liable to ADF, under both New York Law and the DTSA, for misappropriation of its trade secrets. Ascot is also separately liable for breaching each of the above identified provisions of the Agreement.

Turning to remedy, "damages for misappropriation of a trade secret may be measured by either plaintiff's losses or the profits or other benefits gained by defendants through the use of the

34

trade secret." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns Inc.*, 891 F. Supp. 935, 942 (S.D.N.Y. 1995), *aff'd*, 118 F.3d 955 (2d Cir. 1997); *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir.1991) ("The amount of damages recoverable in an action for misappropriation of trade secrets may be measured either by the plaintiff's losses . . . or by the profits unjustly received by the defendant."); *Marky's Martial Arts, Inc. v. FC Online Mktg., Inc.*, No. 19 Civ. 3363, 2022 WL 18276016, at *7 (S.D.N.Y. Sept. 16, 2022) ("Damages for misappropriation of a trade secret may be measured by either a plaintiff's losses or the profits unjustly gained by a defendant through the use of the trade secret."). Once a plaintiff shows the sales amounts from a misappropriation, it is the burden of the defendant to put on evidence with respect to cost associated with the revenues. *Volkswagen Aktiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447, 1995 WL 605616, at *2 (S.D.N.Y. July 13, 1995) (in Lanham Act case for disgorgement of profits, court awarded revenues from violation where defendant put on no evidence with respect to costs associated with revenue).

ADF also seeks injunctive relief preventing further use of their trade secrets by Ascot Valley. The DTSA and New York Law authorize a court to "grant an injunction…to prevent any actual or threatened misappropriation" of a trade secret. 18 U.S.C. § 1836(b)(3)(A) ("[i]n a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may (A) grant an injunction (i) to prevent any actual or threatened misappropriation […] on such terms as the court deems reasonable . . . ."); *see also, e.g.*, *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1235-1236 (W.D.N.Y. 1994) (issuing permanent injunction under New York law against use and disclosure of trade secrets); *Syntel Sterling Best Shores Mauritius Limited*, 68 F.4th at 811 (finding that the "district court's permanent injunction ended Syntel's use of TriZetto's trade secrets" and as a result the harm from misappropriation of trade secrets).

Based on the evidence described above, ADF is entitled to disgorgement damages in the amount of $2,298,114 for the time period from January 1, 2020 to December 31, 2025. ADF is

also entitled to ongoing damages from profits derived from Ascot's sales of meatless meatballs after December 31, 2025.  Lastly, the Court concludes that a permanent injunction is warranted (1) prohibiting Ascot from using or disclosing ADF's trade secrets; (2) requiring return or destruction of all materials containing such information.

## CONCLUSION

For the reasons stated in the Court's findings of fact and conclusions of law, Ascot Valley is entitled to $100,706.96, plus interest, on its claim for unpaid invoices for goods ordered, delivered, and accepted.  ADF is entitled to $2,298,114, constituting Ascot Valley's profits from the misappropriation of ADF's trade secrets, as well as further profits beginning in 2026.  The Court also concludes that ADF is entitled to injunctive relief barring Ascot Valley from continuing to use ADF's trade secrets.

The Parties are directed to file the direct testimony affidavits and deposition transcripts on the public docket within seven (7) days of this Order.

Within seven (7) days of this Order, the parties are also directed as follows: Ascot Valley is hereby **ORDERED** to file a proposed judgment with interest calculations stemming from the damages established in Count I.  On the same date, ADF is **ORDERED** to file a proposed judgment for their trade secrets claim, including a procedure for calculating damages beyond the year 2025.  ADF is also **ORDERED** to file a proposed permanent injunction order.

Within 14 days of this Opinion, the parties shall meet and confer, and shall file a joint proposed judgment and injunction order.  If the parties cannot agree, they may instead file a joint letter, not to exceed three pages, identifying any objections to the proposed judgments or injunction orders proposed by the opposing party, and attaching proposed changes, including redlines of such proposed changes.

The Clerk of Court is respectfully requested to terminate ECF Nos. 139 and 151.


SO ORDERED.

Dated: June 26, 2026
      New York, New York

DALE E. HO
United States District Judge